Opinion issued August 29, 2013



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00574-CV

———————————

**ILIGHT TECHNOLOGIES, INC., Appellant**

**V.**

**CLUTCH CITY SPORTS & ENTERTAINMENT, L.P., Appellee**

On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 2009-76645

# O P I N I O N

Clutch City Sports & Entertainment Inc. ("Clutch City") sued iLight Technologies, Inc. ("iLight") for strict liability manufacturing defect and for negligence. A jury found iLight liable under these theories and determined that Clutch City had incurred damages in excess of $2.5 million. iLight appeals the trial court's judgment rendered on the jury's verdict. Raising three issues, iLight contends that the evidence is legally insufficient to support the judgment, challenging the two liability findings and the damages award.

We reverse and render.

## Background Summary

The Toyota Center, a sports and entertainment facility in downtown Houston, opened in 2003. It is the home of the Houston Rockets and a venue for other sporting and entertainment events. Clutch City operates, maintains, and manages the Toyota Center. Clutch City entered into a "naming rights agreement" with Gulf States Toyota to have the venue named "Toyota Center." Toyota agreed to pay approximately $5 million a year for the naming rights. As part of that contract, Clutch City agreed to display a lighted "Toyota" logo on the roof of the facility. A sign was installed on the Toyota Center roof, outlining Toyota's logo. The sign was illuminated by red Plexineon light emitting diode ("LED") strips manufactured by iLight.

In February 2007, a fire occurred on the Toyota Center roof involving the Plexineon sign. iLight replaced the affected sections of the LED sign without charge to Clutch City. The cause of the 2007 fire was not investigated.

In February 2009, the Plexineon sign caught fire. The fire caused damage to the Toyota Center's roof, which cost $1,217.18 to repair. Clutch City replaced the damaged sections of the LED sign with extra parts of the sign that it had in storage. Clutch City lit the sign at night for another week after the repair but then noticed that other sections of the LED lights appeared melted. For safety reasons, Clutch City decided not to illuminate the sign.

Clutch City requested that iLight replace the damaged Plexineon sign at iLight's expense. iLight declined to replace the sign without charge. It asserted that Clutch City's use of a bleach-and-water solution and a high-pressure washer to clean the roof had caused the deterioration and corrosion of the lights, which led to their failure. iLight offered to replace the damaged portions of the LED sign at a reduced cost. Clutch City refused the offer. The parties were unable to reach an agreement with regard to replacement of the damaged sign. Clutch City replaced the damaged portions of the roof-top sign in August 2011, replacing between 500 and 800 feet of the sign. The replacement cost was $168,434.61.

The illuminated roof-top sign is an important part of Toyota's naming rights agreement with Clutch City because it is a high-profile advertising medium.

3

However, even after the 2009 fire, Toyota continued to pay Clutch City the approximate $5 million as required by the naming rights agreement. Clutch City negotiated an arms-length agreement with Toyota to offset the loss of advertising that resulted from turning off the lights on the sign. Clutch City provided Toyota with certain "make goods" in the form of alternate advertising media in the Toyota Center. From February 2009 to August 2011, Clutch City claimed that it provided alternative advertising to Toyota worth approximately $4.675 million.

Clutch City filed suit against iLight in November 2009. Over the course of the litigation, Clutch City refined its claims against iLight. In its fourth amended petition, Clutch City alleged that the fire was caused by an electrical short in the LED strip, which had resulted from iLight's defective manufacturing process. Clutch City also alleged that iLight had been aware of defects in the LED lights but had failed to warn Clutch City of the defects. Clutch City asserted claims against iLight for strict products liability and for negligence.

As damages, Clutch City requested the cost to repair the Toyota Center's roof and the cost to replace the damaged portion of the sign. In addition, Clutch City sought damages for the "loss of use" of the roof and the sign following the 2009 fire. Clutch City asserted that the loss-of-use damages were measured by the value of the "make goods" or alternate advertising provided to Toyota. In other

4

words, Clutch City asserted that it was entitled to $4.675 million for loss-of-use damages.

Clutch City tried the case to a jury on three theories of liability: strict liability manufacturing defect, strict liability marketing defect, and negligence. In support of its manufacturing defect claim, Clutch City offered the testimony of two experts. The report of one of those experts was also admitted into evidence. In addition, Clutch City relied on evidence from a federal lawsuit filed by iLight against the manufacturer of the LED light strip contained in iLight's Plexineon light product.

Of the three liability theories submitted, the jury found iLight liable for strict liability manufacturing defect and for negligence, but it did not find iLight liable for strict liability marketing defect. The jury awarded the following damages: (1) $1,217.81 for the cost of repairs to the roof; (2) $168,434.61 for the cost of the LED sign replacement; and (3) $2,337,575.00 for loss of use of the roof and LED sign. The trial court rendered judgment on the jury's verdict.

iLight had objected to the jury charge on the basis that there was legally insufficient evidence to submit any of the liability claims to the jury. iLight also filed post-judgment motions in which it challenged the legal sufficiency of the evidence to support the jury's liability findings on strict liability manufacturing

5

defect and negligence.  It further challenged the legal sufficiency of the evidence to support the loss-of-use damages awarded to Clutch City.  This appealed followed.

**Legal Sufficiency**

iLight presents three issues on appeal.  In its first two issues, it contends that the evidence was legally insufficient to support the liability findings.  iLight's third issue challenges the sufficiency of the evidence to support the jury's award of loss-of-use damages.

**A.    Standard of Review**

Because it is attacking the legal sufficiency of the evidence supporting adverse findings on issues for which it did not have the burden of proof, iLight must show that no evidence supports the jury's adverse findings.  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)).  Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review."  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not.  *Id.*  So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder.  *Id.* at 822.  The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their

6

testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

This court may sustain a legal sufficiency (or no evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence is no more than a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Id.* (citing *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

## B.    Manufacturing Defect

In its first issue, iLight challenges the legal sufficiency of the evidence to support the jury's affirmative finding to the following question: "Was there a manufacturing defect in the Plexineon product at the time it left the possession of iLight that was a producing cause of the occurrence in question?"

A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 540 (Tex. 2011); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Ridgway*, 135 S.W.3d at 600.

The jury in this case was properly instructed with the following definition of a "manufacturing defect:"

> A "manufacturing defect" means that the product deviated in its construction or quality from its specifications or planned output in a manner that renders it unreasonably dangerous. An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics.

iLight contends that Clutch City failed to offer more than a scintilla of evidence to show that the Plexineon light product "deviated in its construction or quality from its specifications or planned output." The Supreme Court of Texas has made clear that a showing that the product deviated in its construction or quality from specifications or planned output is essential to maintaining a strict liability manufacturing defect claim. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d

8

32, 41 (Tex. 2007); *see also Dewayne Rogers Logging, Inc. v. Propac Indus.*, 299 S.W.3d 374, 383 (Tex. App—Tyler. 2009, pet. denied) (affirming summary judgment when plaintiff offered no evidence showing that machine deviated from specifications or planned output when it left manufacturer's possession).[1] This requirement is in addition to showing that the product was defective when it left the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *See Ledesma*, 242 S.W.3d at 42. The supreme court explained that "[t]he requirement of a deviation from the manufacturer's specifications or planned

---

[1] Courts in other jurisdictions have held that a plaintiff has failed to show a manufacturing defect when no showing is made that the product deviated from the manufacturer's design specifications or its intended performance standards. *See, e.g.*, *Linden v. CNH America, L.L.C.*, 673 F.3d 829, 834 (8th Cir. 2012) (affirming trial court's determination that plaintiff had failed to introduce sufficient evidence of manufacturing defect and discussing distinction between manufacturing and design defects); *In re Coordinated Latex Glove Litig.*, 121 Cal. Rptr.2d 301, 315–16 (Cal. Ct. App. 2002) (holding no manufacturing defect claim shown when plaintiff failed to present evidence latex gloves did not meet design specifications); *Welch v. Technotrim Inc.*, 778 So.2d 728, 733 (La. Ct. App. 2001) (upholding summary judgment because plaintiff could not produce evidence of deviation from specifications or performance standards); *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (holding expert's testimony alleging defect in ladder was insufficient to prove manufacturing defect under Mississippi law because there was no evidence that flaw deviated from manufacturer's design); *Atkins v. Gen. Motors Corp.*, 725 N.E.2d 727, 731 (Ohio Ct. App. 1999) (concluding trial court properly granted summary judgment on manufacturing defect claim because plaintiffs did not show or claim that product deviated in any material way from manufacturer's design specifications, formula, or performance standards).

output serves the essential purpose of distinguishing a manufacturing defect from a design defect."[2] *Id.*

At trial, Clutch City's primary theory of a manufacturing defect was that faulty soldering within the LED light strip caused a short circuit that in turn led to overheating and the fire. Subsidiary to this theory, Clutch City also presented expert testimony that unknown contaminants within the internal portion of the LED light strips and corroded components also constituted manufacturing defects, which possibly caused the fire.

To determine what caused the lights to fail, Clutch City sent a section of the LED lights that had thermal damage to Insight Analytical Labs ("IAL") for testing. At trial, Gary Shade, who works for IAL, testified by deposition. He stated that he analyzed and tested a six-foot long section of the lights, which showed evidence of thermal damage. He testified that x-ray imaging of the light section revealed that

---

[2]     Other jurisdictions and the Restatement of Torts also recognize manufacturing defect and design defect as distinct theories of liability. *See Linden*, 673 F.3d at 834. For example, the Eleventh Circuit Court of Appeals has explained the distinction as follows:

> This distinction between "aberrational" defects and defects occurring throughout an entire line of products is frequently used in tort law to separate defects of manufacture from those of design. . . . Stated another way, the distinction is between an unintended configuration [a manufacturing defect], and an intended configuration that may produce unintended and unwanted results [a design defect].

*Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989).

an anomalous "solder bridge" had developed between the "common" or ground power strip and the supply power strip, causing a short circuit.

According to Shade, his investigation revealed that excessive solder was used to attach the supply wire to the supply strip. The excess solder had migrated, acting as a conductor between the supply strip and the ground strip. This created a short circuit, allowing an excessive flow of current. This led to overheating in close proximity to the plastic on the lights. Shade opined that this caused thermal damage to the lights and also led to the fire.

Shade testified that, although the "excess" solder would have been present at the time it left iLight's possession, the solder bridge connecting the supply and ground strips would not have initially been present. He stated that there was likely a gap between the solder holding the supply wire in place and the ground strip when the strip was originally manufactured. Shade explained that, over time, such things as temperature changes, humidity, and corrosion likely caused the excess solder to make contact with the ground strip, creating a bridge, shorting the two strips together.

Clutch City points to Shade's testimony as evidence supporting the jury's manufacturing-defect finding. However, it is a matter of logic that to demonstrate how a product deviated from its specifications or planned output would first require a showing of what the manufacturer's specifications or planned output are

11

for that product. Shade did not testify regarding what the product specifications required, if anything, with respect to the soldering of the supply wire, including the amount or positioning of the solder. When asked whether he had reviewed the plans or specifications for the Plexineon light product, Shade responded that he did not have access to them.

Even presuming that iLight had no express design specifications for the soldering, no evidence showed whether the supply wire had been soldered in a manner or in a configuration unintended by iLight. Shade gave no testimony indicating why he characterized the solder attaching the supply wire as "excess" solder. Shade did not explain whether he believed that the product specifications called for what he termed "excess" solder or whether the solder used was in excess to what iLight had intended or planned when the product was manufactured.

When asked whether "a mistake was made" when the supply wire was soldered, Shade replied, "That would be the conclusion, yes." However, "[e]xpert opinions must be supported by facts in evidence, not conjecture." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003) (citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995)). An expert's simple ipse dixit is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). "[I]f no basis for the opinion is offered, or the

12

basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence." *Id.* Here, Shade did not explain the basis for his conclusion that "a mistake" was made with respect to the soldering. To the contrary, if the manner of soldering did not depart from iLight's intended process or configuration, then there was no manufacturing defect.

In short, iLight's product specifications or planned output may have addressed or taken into consideration the soldering process and quantified the amount, or indicated the placement, of solder to be used in a solder joint; however, no evidence was presented on this point. For this reason, it is possible that iLight complied with its own product specifications and planned output with respect to the soldering process. In other words, it may be that iLight did exactly what it intended to do with respect to manufacturing and soldering the Plexineon product but did not solder the supply wire in accordance with industry standards or what hindsight has determined to be a faulty design. If so, the faulty soldering may be a matter of design defect rather than manufacturing defect. *See Cooper Tire & Rubber Co.*, 204 S.W.3d at 808 (noting, in discussion of causation issue, that plaintiff's expert had not eliminated possibility of design defect). In any event, Shade's testimony presented no evidence that, when it left iLight's possession, the Plexineon sign deviated in its construction or quality from iLight's specifications or planned output or that the product in any way departed from exactly how iLight

13

had intended to manufacture it. *See Pollock*, 284 S.W.3d at 818; *see also Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (holding that legal-sufficiency challenge may be made to expert testimony that is speculative or conclusory on its face, even in the absence of valid objection to its admissibility).

Clutch City also presented the expert testimony of Kurt Humphrey, an experienced engineer, to support its manufacturing claim. In addition to his testimony at trial, Clutch City introduced Humphrey's expert report into evidence. As had Shade, Humphrey also examined sections of the Plexineon sign exhibiting thermal damage. He testified that x-ray imaging showed "solder bridging" between power and ground strips. Humphrey wrote in his report that "the 'solder bridge' identified in the IAL report is a plausible explanation for the localized overheating." Humphrey characterized the solder bridging as a "manufacturing defect." However, Humphrey neither testified about, nor discussed in his report, iLight's specifications for the product or how iLight had intended the soldering to be done on its product. In short, with respect to the allegation of faulty soldering, Humphrey's expert opinion presented no evidence that the Plexineon product deviated in its construction or quality from how iLight intended or planned to manufacture the Plexineon product. *See Pollock*, 284 S.W.3d at 818.

14

Clutch City also points to its evidence from the federal lawsuit filed by iLight against Marktech—the company that supplied the LED light strips to iLight for its Plexineon product—as showing that the product deviated in its construction or quality from its specifications or planned output. In that suit, iLight has alleged that Marktech supplied it with defective LED strips. At trial, iLight's CEO, Sean Callahan, testified that the defect alleged in that case arises from complaints by iLight's customers that the LED strips supplied by Marktech cease to illuminate or light up. The suit is not premised on allegations that the LED strips are overheating and causing fires.

iLight's federal complaint does indicate, in general terms, that Marktech did not follow iLight's product specifications in manufacturing the LED strips. In the complaint, iLight alleges that Marktech failed to follow specifications by switching component parts. Clutch City also points to an affidavit in the federal suit, signed by Sean Callahan, in which he states that another company, Cree, which supplies LEDs to Marktech, had claimed that Marktech had failed to control "temperatures and the duration" during wave soldering. None of the evidence from the federal lawsuit, however, addresses soldering specifications or planned output by which the jury could have measured any deviation. Nor does that suit contain allegations by iLight that Marktech used excess solder material or that anomalous solder bridging caused the product failures claimed in that litigation. The evidence from

15

that suit is of little probative value in determining whether the Plexineon product deviated in its construction or quality from its specifications or planned output with respect to the allegations in this suit.

We hold that iLight did not present legally sufficient evidence to show that the Plexineon sign deviated in its construction or quality from its specifications or planned output with respect to the claim that faulty soldering constituted a manufacturing defect. However, as mentioned, Clutch City also offered evidence at trial identifying other conditions in the Plexineon product that it asserted constituted manufacturing defects.

Clutch City's process engineering expert, Kurt Humphrey, testified that, in addition to the "soldering bridge," he detected other anomalous conditions in sections of the Plexineon product that he analyzed. He identified these conditions in his expert report. Specifically, Humphrey identified the following conditions that he referred to as "manufacturing defects": (1) unknown internal contaminants found within the plastic encasement of the LED light strip and (2) corrosion and discoloration of solder joints, resulting from an unknown chemical reaction, causing degradation of the joints. He testified that these conditions would have occurred during, and been present since, the manufacturing process. Humphrey's testimony regarding these conditions provided some evidence to show a deviation in quality from the planned output. Contaminants and corroded solder joints are

16

not elements that a manufacturer, such as iLight, would intend or plan to incorporate into its product during the manufacturing process. *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997) (holding that pesticide found in cigarettes is a deviation from the planned output type of defect because no cigarette manufacturer would intend to include pesticides in its cigarettes). Nonetheless, to prove its strict liability manufacturing defect claim, Clutch City was still required to show that such manufacturing defects were a producing cause of the fire. *See Ridgway*, 135 S.W.3d at 600.

iLight contends that Clutch City offered legally insufficient evidence to establish producing cause. Because we have determined that legally insufficient evidence was offered to show that the faulty or excess solder was a deviation from specifications or planned output—and thus could not serve to establish a manufacturing defect—we do not analyze whether such alleged defect was a producing cause of Clutch City's injuries. Instead, we limit the analysis to determining whether evidence was presented to show that the other manufacturing defects specifically identified by Humphrey—such as, unknown internal contaminants and degraded solder joints—were producing causes of the fire.

## C.    Producing Cause

The jury charge asked whether there was a manufacturing defect in the Plexineon product at the time it left iLight's possession that was a producing cause

of the fire. "Producing cause" was correctly defined as a "cause that was a substantial factor in bringing about the occurrence, and without which the occurrence would not have occurred." The charge also informed the jury that there may be more than one producing cause. A producing cause must be a cause-in-fact; that is, it must be a substantial factor in bringing about the injury, and a cause without which the injury would not have happened. *See BIC Pen*, 346 S.W.3d at 541; *Ledesma*, 242 S.W.3d at 46.

Expert testimony is generally required in manufacturing defect cases to prove that the specific defect caused the accident. *BIC Pen*, 346 S.W.3d at 542; *see Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) ("Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition.").

Clutch City's usage of the bleach-and-water solution and a high pressure washer was iLight's primary defense at trial. It argued that the use of this cleaning method accounted for the degradation and corrosion observed in the Plexineon product. In his report and at trial, Humphrey opined that the degradation and corrosion observed in the internal components of the product may have led to a short circuit, to overheating, and to the fire. However, based on tests that he

18

conducted, Humphrey ruled out the bleach-and-water solution used to clean the Toyota Center roof as a cause for the degradation and discoloration that he saw in the internal components of the Plexineon light product.  In his report, Humphrey's wrote, "[T]he specific locations and variation in severity among the examined sites showing discoloration, staining, degradation of the solder joints, and evidence of overheating appear to be inconsistent with chemical attack from an external source as a root cause of the anomalies."

Humphrey's report continues,

[A]lternative mechanisms and other contributing factors, including but not limited to, contamination during manufacturing, e.g. pre-encapsulation contamination, soldering anomalies, material failures, and component failures, must be considered as more likely causes for the discoloration, degradation, and evidence of localized overheating observed among the iLight lighting samples examined.  Although the root cause of the localized heating in this particular case remains undetermined, manufacturing defects, e.g. soldering anomalies (as indicated in IAL's failure analysis report) and contaminants; component failures, e.g. discrete component failures including LEDs, resistors, voltage regulators, constant current drivers, etc., product design flaws or inadequate tolerances, and/or material integrity failures are among the most common and suspected culprits.

The results of this preliminary investigation of selected iLight Plexineon® LED lighting samples from the Toyota Center and review of provided technical documentation point to: 1) LED strip fabrication defects and/or contaminants, 2) intrinsic material or component failure, and/or 3) fundamental design flaws or sensitivities associated with 1) or 2) as the most likely causes of the lighting failures. Preliminary assessment of the installation, maintenance, and cleaning methods and procedures used at the Toyota Center with respect to the iLight Plexineon® LED lighting system appear to be consistent with iLight requirements and general engineering practice.  Although the

19

root cause of the Toyota Center LED lighting fires remains unknown at this time, the preponderance of evidence points to the potential causes enumerated above, not installation or maintenance conditions.

The results of this preliminary investigation are insufficient to draw firm conclusions regarding the root cause(s) of the iLight Plexineon® LED lighting localized heating and related fires. It is recommended that: 1) further product investigations, including x-section and EDS (or other chemical analysis) be performed at selected sites on iLight Plexineon® LED lighting samples to gather more data to inform root cause failure analysis, 2) detailed technical information be provided by iLight and its suppliers describing key process steps and capabilities, PCB layout dimensions and tolerances, components, equipment, and materials used in the fabrication of the iLight Plexineon® LED lighting system in question, and 3) request input from iLight regarding Plexineon® LED lighting design parameters, product test and reliability data, and product safeguards with respect to over-power, over-current, and over-temperature conditions.

In sum, rather than establishing what specific condition caused the fire, Humphrey's report ruled out what did not cause the fire; that is, it eliminated Clutch City's cleaning and maintenance, including its use of bleach on the lights, as a cause for the product failure and the fire. The report enumerated possible causes of the fire, including not only what Humphrey termed "manufacturing defects," but also "product design flaws" and "fundamental design flaws."

At trial, Humphrey somewhat narrowed his opinion. He testified that he believed the probable cause of the fire was a short circuit associated with conditions he called "manufacturing defects." However, as he did in his report, he stated that his analysis was preliminary in nature because he did not have sufficient detailed information and had not conducted an adequate in-depth analysis to

20

determine the "root cause" or a specific cause of the fire. Humphrey opined that the fire could have been caused by any one of the "manufacturing defects" that he identified, including a soldering anomaly as found by Shade and IAL.

In its brief, Clutch City points out that it was required only to show that a manufacturing defect was a substantial factor in bringing about the fire and was not required to show that a manufacturing defect was the singular cause of the fire. *See Ledesma*, 242 S.W.3d at 45–46. Nonetheless, Clutch City was required to show that the fire would not have occurred in the absence of a manufacturing defect. *See id.* at 46. We agree with iLight that Clutch City did not make this showing.

Although he testified that he believed a "manufacturing defect" caused the fire, Humphrey did not address in his testimony which manufacturing defect was the most likely cause. To the contrary, Humphrey made clear that further study and analysis was required to determine which of the identified manufacturing defects caused the fire. Among the defects he recognized was the soldering anomaly as identified by Shade. As discussed *supra*, legally insufficient evidence was presented at trial to establish the soldering anomaly as a "manufacturing defect," as defined by the jury charge and the law. Humphrey did not assign any more likelihood to the soldering anomaly being the manufacturing defect that caused the fire than he did to the other manufacturing defects that he identified.

21

Similarly, Clutch City offered no proof to address whether a design defect may, or may not, have been a cause for the fire. In contrast, Humphrey's report expressly identified "fundamental design flaws" as a possible cause. His report did not assign any more likelihood to a manufacturing defect being the cause of the fire than a design defect.

The evidence presented by Clutch City did not contain proof that manufacturing defects, such as unknown contaminants or corroded parts, were more likely causes of the fire than a soldering anomaly. Nor did Clutch City eliminate design defect as a possible cause of the fire. *See Cooper Tire*, 204 S.W.3d at 807 ("[E]ven if plaintiffs had eliminated every conceivable reason for the tire failure other than a product defect existing when the tire left Cooper Tire's plant, they did not eliminate the possibility of a design defect.") Accordingly, there was less than a scintilla of evidence from which the jury could have determined that the source of the fire was one of the alleged defects that it could have found to be a manufacturing defect. *See Tamez*, 206 S.W.3d at 583.

We hold that the evidence was legally insufficient to show that a manufacturing defect was a producing cause of the fire. We sustain iLight's first issue.

22

**D.     Negligence**

iLight challenges the legal sufficiency of the evidence to support the jury's affirmative finding that iLight's negligence proximately caused the fire.   The charge defined negligence as "the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances."

To support the jury's negligence finding, Clutch City points to the testimony of iLight's CEO, Sean Callahn, in which he stated that iLight's quality assurance and quality control procedures did not detect the product defect that was involved in iLight's federal lawsuit against Marktech, the manufacturer of the LED light strips.   Clutch City also premises its negligence claim on iLight's knowledge that the Plexineon product contained defective LED lights sold to it by Marktech. Clutch City intimates that iLight knew of the defects when it replaced the Plexineon sign on the Toyota Center roof following the 2007 fire.   On appeal, Clutch City asserts that "iLight discovered that its LED sign parts [sold to it by Martech] were defective as early as late 2007, but there was no change in quality control procedures, manufacturing, or any warnings to Clutch City prior to the 2009 fire."

23

Clutch City offered into evidence filings from iLight's federal lawsuit against Marktech indicating that iLight had submitted LED light strips to independent laboratories for testing in late 2007 and that the testing had shown the strips were defective. In an affidavit from the federal litigation, CEO Sean Callahan testified that iLight had been told by Cree—the company who supplied the LEDs to Marktech—that Marktech was using too much heat when soldering the LED lights. At trial, Callahan explained that Cree claimed that the heat used by Marktech to solder the LEDs was too high, thereby damaging the LED lights supplied by Cree to Marktech. However, there was no evidence that the soldering issue reported to iLight by Cree was an issue of excess solder or solder bridging, which is the primary defect alleged in this suit.

At trial, Callahan testified that the defect at issue in the federal litigation with Marktech involved a failure of the LED lights to continue to illuminate. Callahan testified that it was determined that power was not reaching the LEDs to illuminate them. In other words, the lights were going out, and iLight's customers experiencing this problem were dissatisfied. Callahan testified that to determine whether the LEDs had the illumination defect at issue in the Marktech suit required destructive testing of the product. Callahan stated that he was not aware that the illumination defect at issue in the federal suit resulted in any overheating problems

or in any fires.  Callahan indicated that iLight had not informed Clutch City of the Marktech issue because it did not affect Clutch City.

As part of its negligence claim, Clutch City was required to show that iLight's alleged negligence proximately caused the fire.  *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).  Here, the jury was instructed,

> "Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

Corresponding to producing cause in the strict products liability cause of action, proximate cause in the negligence cause of action required proof that iLight's acts or omissions were a substantial factor in bringing about the fire and without which the fire would not have occurred.  *See Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835 (Tex. 2009).

Here, even presuming iLight had a duty (1) to warn Clutch City about the illumination defect, (2) to change its quality control procedures to detect the illumination defect, and (3) to change its manufacturing process to prevent the illumination defect, there is no evidence that but for these failures the fire would not have occurred.  *See Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002) (applying but for causation requirement to negligence case).  No evidence was introduced showing that the failure-to-illuminate problem at issue in

the federal suit was caused by, or was related to, the defects alleged to have caused the fire in this suit. In short, less than a scintilla of evidence was offered to show a correlation between the failure-to-illuminate defect and the fire. Thus, we hold that the evidence was legally insufficient to establish the element of proximate causation and to support the jury's negligence finding.

We sustain iLight's second issue.[3]

## Conclusion

We hold that the evidence was legally insufficient to support the jury's affirmative liability findings for strict liability manufacturing defect and for negligence. These are the only two liability findings supporting the judgment. Accordingly, we reverse the judgment of the trial court and render judgment that Clutch City take nothing by its claims against iLight.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Brown, and Halbach.[4]

---

[3] Because of the resolution of issues one and two, we do not reach the third issue, which challenges the legal sufficiency of the evidence to support the loss-of-use damages.

[4] The Honorable Joseph "Tad" Halbach, Judge of the 333rd District Court of Harris County, participating by assignment.