ACCEPTED
04-14-00562-cv
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
1/29/2015 1:27:44 PM
KEITH HOTTLE
CLERK

# NO. 04-14-00562-CV

IN THE TEXAS COURT OF APPEALS FOR THE FOURTH DISTRICT
SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
01/29/2015 1:27:44 PM
KEITH E. HOTTLE
Clerk

\* \* \* \* \*

**JESUS DE LOS SANTOS, JR., Individually and as Representative of the ESTATE OF JESUS FRANCISCO DE LOS SANTOS, and JUAN DE LOS SANTOS, Appellants; and MARCO ANTHONY SOLIS, JR., Cross-Appellant,**

v.

**FORD MOTOR COMPANY,**

**Appellee**

\* \* \* \* \*

On Appeal from the 79th Judicial District Court
Jim Wells County, Texas
Trial Court Cause No. 11-08-50394-CV

\* \* \* \* \*

**REPLY BRIEF OF APPELLANTS, JESUS DE LOS SANTOS, JR. INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JESUS FRANCISCO DE LOS SANTOS AND JUAN DE LOS SANTOS**

Brendan K. McBride
State Bar No. 24008900
Brendan.mcbride@att.net
MCBRIDE LAW FIRM Of Counsel to
 GRAVELY & PEARSON, LLP
425 Soledad, Suite 600
San Antonio, Texas 78205
(210) 472-1111
(210)881-6752 (Facsimile)

Jeffrey G. Wigington
State Bar No. 00785246
jwigington@wigrum.com
R. Reagan Sahadi
State Bar No. 24042369
rsahadi@wigrum.com
WIGINGTON RUMLEY DUNN
 & BLAIR, LLP
123 N. Carrizo St.
Corpus Christi, Texas 78401
(361) 881-7500
(361) 884-0487 (Facsimile)

**ATTORNEYS FOR APPELLANTS, JESUS DE LOS SANTOS, JR. INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JESUS FRANCISCO DE LOS SANTOS AND JUAN DE LOS SANTOS**

**ORAL ARGUMENT REQUESTED**

i

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

ARGUMENT SUMMARY ................................................................................. 1

ARGUMENT AND AUTHORITIES ................................................................ 3

I.  THE EVIDENCE SUPPORTED THAT THE EMBRITTLEMENT FRACTURE IN
    THE AXLE WAS A DEVIATION FROM THE PLANNED OUTPUT THAT
    CAUSED THE AXLE TO FAIL. ................................................................. 3

    A.  Ford's Own Expert Herrera: If the Axle Broke During the Slide, It
        Was Defective Because It Did Not Perform As Intended. .................... 4

    B.  The Fact That A "Recipe" Makes a Manufacturing Defect
        *Possible* Does Not Transform a Manufacturing Defect Into A
        Claim Solely For Design Defect. ....................................................... 6

    C.  Clauser Testified The Heat Treating Process Caused This Axle to
        Be Embrittled. .................................................................................. 8

II. THE TRIAL COURT DID NOT MAKE ANY DAUBERT/ROBINSON RULING;
    CLAUSER'S OPINIONS ABOUT MANUFACTURING DEFECT WERE BASED ON
    A RELIABLE FOUNDATION .................................................................. 13

CONCLUSION .............................................................................................. 18

CERTIFICATE OF SERVICE ...................................................................... 21

CERTIFICATE OF COMPLIANCE ............................................................. 21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997) ............................................. 4

*BIC Pen Corp. v. Carter*, 346 S.W.3d 533 (Tex. 2011) ............................................................ 4

*Casey v. Toyota Motor Eng'g & Mfg of N. Am.*, 77 F.3d 322 (5th Cir. 2014) ...................... 11

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005) ............................................................ 2

*Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797 (Tex. 2006) ................................ 4, 11

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) ..................................................... 4, 9

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598 (Tex. 2004) .................................................... 4, 9

*Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713 (Tex. 1998) ...................................... 14

*iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.*, 414 S.W.3d 842 (Tex. App. –
    Houston [1st Dist.] 2013, pet. denied) ............................................................................ 9

*Kindred v. ConChem, Inc.*, 650 S.W.2d 61 (Tex. 1983) ......................................................... 8

*Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747 (Tex. App. – San Antonio 2002, no pet.) 14

*Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828 (Tex. 2009) ................................. 1

*Torres v. Caterpillar, Inc.*, 928 S.W.2d 233 (Tex. App. – San Antonio 1996, writ denied) 8

*Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000) ........................................................ 4

**ARGUMENT SUMMARY**

The issue in this appeal concerns the relationship between defects in design and manufacture in a product liability action. Appellants were prohibited from asking the jury whether the product in question was defective in its manufacture. The rear axle of the subject pickup was shown to have a subsurface crack in the metal that caused it to fail when subjected to much less force during a sideways slide than it was intended to withstand. There was evidence that this particular axle had the subsurface cracking and that – while the design process and metal "recipe" made it possible for this sort of manufacturing defect to occur during manufacturing – the defective condition itself was in the nature of a manufacturing defect because it was a deviation from the intended output.

Put another way, when *every* product in a given line is unreasonably dangerous because of the process or recipe, there is a design defect. However, when only certain units of the product leave the process in an unreasonably dangerous condition – the claim is for *manufacturing* defect. The evidence in this case clearly supported that this was a deviation from the planned output. The jury should have been asked to determine whether there was a manufacturing defect.

At this stage, this appeal is a review of the record to determine whether there was a scintilla of evidence to support a manufacturing defect claim. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). If there was, then the Court must reverse and remand for a new trial. Ford tries to focus the Court on its

1

own preferred facts to the exclusion of the controverting evidence as though this were a jury trial – it is not. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

Thus, the Court's review of the record is constrained to evidentiary sufficiency and Ford bore a heavy burden to establish that there was less than a scintilla of evidence. Its failure to do so in the trial court denied Appellants a fair opportunity to present their claims to the jury. To the extent Ford tries to draw the Court's focus to contrary evidence, those are matters that should be addressed to a jury.

Ford tries to skirt this issue by suggesting the directed verdict was granted because of Ford's *Daubert/Robinson* challenge to Appellants' expert, Clauser. However, the record shows otherwise. The trial court did not even rule on a *Daubert/Robinson* challenge and clearly granted a directed verdict on the legally mistaken notion that if the design of a product makes manufacturing defects more likely, the claim solely presents a design defect theory. *It is Ford* – and not the Appellants – who bear the burden of establishing the trial court abused its discretion in allowing Clauser to testify. Clauser supported his manufacturing defect opinions with specific and reliable facts and scientific analysis, backed up by peer-reviewed publications and corroborated by the work and opinions of other experts whose opinions Ford does not challenge.

2

On this record, this was an error that was even obvious to the jury, which sent out a question specifically inquiring why it was not asked to find a manufacturing defect after deliberations began. The trial court erred in granting a directed verdict. This Court should reverse and remand for a new trial.

## ARGUMENT AND AUTHORITIES

### I. THE EVIDENCE SUPPORTED THAT THE EMBRITTLEMENT FRACTURE IN THE AXLE WAS A DEVIATION FROM THE PLANNED OUTPUT THAT CAUSED THE AXLE TO FAIL.

Ford continues to try to conflate a deviation from the planned output from a production process with a design defect, arguing – quite illogically – that any manufacturing defect that is made more likely by the design or process is solely a design defect. If that were true, there would be no manufacturing defects, because every deviation from the planned output is made possible by the design of the product and the intended manufacturing process.

Contrary to Ford's attempts to conflate the two, Texas law recognizes a clear distinction between design defects and manufacturing defects – and this Court need only ask one question to determine this appeal: Does the evidence show that every product produced by this process was unreasonably dangerous or does it show that only occasionally would this process produce unreasonably dangerous products? If the latter, the evidence supports a manufacturing defect claim and it was error to grant a directed verdict.

3

At the outset, Ford insists on mischaracterizing the definition of a "manufacturing defect" under Texas law, insisting that the only way to prove a manufacturing defect is to point to something in the design drawings or specifications the product did not meet. That simply is not consistent with how Texas law defines a "manufacturing defect."

The following is the actual, legal definition:

> *A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications <u>or planned output</u> in a manner that renders it unreasonably dangerous.*

This definition has been repeated numerous times by the Texas Supreme Court.[1] It applies when an unreasonably dangerous condition is a deviation from either the specifications or the planned output. Here, there is more than a scintilla of evidence that Ford axles were intended to *not* be embrittled with subsurface cracks so that they could withstand more than 120,000 inch pounds of force in a sideways slide without breaking.

## A. Ford's Own Expert Herrera: If the Axle Broke During the Slide, It Was Defective Because It Did Not Perform As Intended.

Indeed, the deviation from the expected ductile strength was established in part by Ford's own expert, Dr. Herrera, who ran a set of tests on non-defective axles

---

[1] Emphasis added. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 540 (Tex. 2011); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41 n16 (Tex. 2007); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *see also Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex. 2000) ("A product has a manufacturing defect if its construction or quality deviates from the specifications or planned output in a way that is unreasonably dangerous."); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)(same).

showing they resist up to 120,000-128,000 inch pounds of force before failing. (RR12:107) There was no dispute between the experts that if this axle broke during the sideways slide, it would have broken at forces that were around one-fourth of what it should have survived – 32,000 inch pounds. (RR13:39) Critically, even Ford's own expert agreed that *if* the axle broke during the sideways slide subjected only to the 32,000 inch pounds of force, then it was probably defective. Dr. Herrera testified:

> Q: If the bending moment for a non-defective axle is 120,000 pounds, roughly?
> A: Correct.
> Q: And if a bending moment of 32,000 pounds, which is what you calculated would be going on in this scenario?
> A: Yes, sir.
> Q: I think you would agree that if there were a bending moment of 32,000 pounds and it did break the axle, that axle would have failed, probably?
> A: Prematurely, probably. I agree . . .
> Q: -- Whatever the reason, it's not supposed to fail at the moment that at least the trooper and Greenlee [sic] have said it failed?
> A: Agreed.
> Q: And if it failed because of things that were done during its manufacturing or design process, that would be a design or manufacturing defect?
> A: If – if that was the cause, yes.

(RR13:39-40)

There was clearly enough evidence for the jury to conclude that the axle broke during the sideways slide at only 32,000 inch pounds when it was intended to resist around 120,000 inch pounds. Both the plaintiffs' accident reconstructionist, William Greenlees, and the Texas DPS's expert accident reconstructionist, Sergeant Hardwick,

5

concluded the axle broke *during* the slide and caused the pickup to roll. (RR4:209-213; 8:59, 64-65; 9:84)

Ford does not challenge the reliability of any of the accident reconstruction opinions. Rather, Ford's arguments boil down to two things: (1) despite Clauser's opinion that *this particular axle* broke because of subsurface cracking that was not the intended output of the manufacturing process and that not all the axles manufactured by Ford's process would be defective, Ford insists that the evidence solely supports a design defect claim; and, (2) the trial court abused its discretion in letting Clauser testify even though Clauser's qualifications were unchallenged and he supported his manufacturing defect with specific facts, logic and scientific examination and evaluation of the broken axle.

### B. The Fact That A "Recipe" Makes a Manufacturing Defect *Possible* Does Not Transform a Manufacturing Defect Into A Claim Solely For Design Defect.

Ford's argument depends considerably on a gross mischaracterization of Clauser's opinion testimony. Clauser was very clearly of the opinion that the axle failed due to a subsurface crack in the metal that weakened it. (RR6:69-111) He based this conclusion on a microscopic examination of the broken axle, by which Clauser was able to find the subsurface crack from which the failure of the axle originated. (RR6:98-100) Clauser repeatedly explained that this was a deviation in

6

this particular unit and that not all axles made through this process would be defective, for example:

> And my contention isn't that all Ford axles are embrittled. It doesn't happen – I don't believe it happens on every axle. So if I went and got another axle that was not embrittled, I would expect to get a much higher bending load to break it than I get on – than you would have gotten on these had you tested it before they were already broken. (RR6:148)

To be clear, Clauser *did* opine that a change to the steel recipe would reduce or eliminate the risk of defective units being produced by that recipe, but that does not mean that the condition of *this* unit was not a manufacturing defect. As the above testimony makes clear, Clauser's opinion was the intent of the process was not to make embrittled axles that could not withstand expected levels of force. This is repeated in Ford's own brief:

> Still, according to Clauser, "the problem is the recipe. **If you correct the recipe, you eliminate the manufacturing defects**, because *then the process . . . makes [a] good axle all the time.*"

Appellee's Brief at 17. The italics were added by Ford to distract the Court from the rest of the sentence – and especially the part where Ford has to acknowledge Clauser believed these were manufacturing defects occurring in particular units.

Thus, when Ford argues on page 21 that the "only alleged defect Clauser identified with the axle was the steel recipe," Ford is attempting to mislead the Court. The only *design* defect Clauser identified was the steel recipe. He clearly identified a manufacturing defect in this particular axle – a subsurface crack in the metal resulting

7

from the embrittlement of the steel during the heat treating process that, in turn, caused the axle to weaken and fail at substantially less force than it was intended to resist.

Ford's reliance on *Kindred v. ConChem, Inc.*, 650 S.W.2d 61 (Tex. 1983), for the proposition that strict liability cases involving chemical composition are *solely* design defect cases is misplaced. To begin with, there was no manufacturing defect even alleged in *Kindred* – it was solely a claim for design and marketing defects. *Id.* at 61. More importantly, a review of the facts does not reveal anything suggesting that the defective paint deviated from its intended output. Rather, the claim was predicated on it being unsuitable as designed for use in the plaintiff's facility and defectively marketed. *Id.* There is nothing in that opinion to suggest that the claim was based on a claim that the particular paint sold to the plaintiff was any different from all the rest of the defendant's paint.

### C. Clauser Testified The Heat Treating Process Caused This Axle to Be Embrittled.

Ford's argument depends next on a subtle attempt to distort Texas law. Ford starts its argument about manufacturing defects by going back to an opinion from this Court in 1996 to find a favorable phrasing of the definition of "manufacturing defect" that it can work with for its argument. Appellee's Brief at 18.[2] Specifically, Ford attempts to create the impression that a manufacturing defect solely revolves around

---

[2] *Citing Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 239 (Tex. App. – San Antonio 1996, writ denied).

the manufacturer's "design specifications" – which Ford argues creates a very narrow constraint on how a party must demonstrate a manufacturing defect.

To accomplish this feat Ford glosses over that ever since *Grinnell*, the Supreme Court of Texas has consistently applied a different definition of manufacturing defect that includes *either* "specifications <u>or planned output</u>." See n1, supra. The omission by Ford is especially glaring given that at least two of the supreme court's opinions applying the broader definition of manufacturing defect *involved Ford as a party*.[3]

Thus, the plaintiff can demonstrate a deviation from either the specifications or the planned output. There was more than a scintilla of evidence that the subject axle deviated from the planned output. As described above and detailed more thoroughly in Appellant's principal brief, the subject axle was "embrittled" during the manufacturing process resulting in a subsurface crack in *this particular axle* that weakened the ability of the axle to withstand expected levels of force.

Clauser did give and support the opinion that the defect occurred during the manufacturing process. Thus, this case is distinguishable from *iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.*, 414 S.W.3d 842 (Tex. App. – Houston [1ˢᵗ Dist.] 2013, pet. denied). In *iLight*, the plaintiff opined that there was extra solder causing a short inside the product, but offered no explanation of whether this was more or less solder than called for in the product's design specifications. *Id.* at 848.

---

[3] *Ford Motor Co. v. Ledesma*, 242 S.W.3d at n16 (Tex. 2007) and *Ford Motor Co. v. Ridgway*, 135 S.W.3d at 600 (Tex. 2004).

9

By contrast, Clauser's examination of the axle showed a subsurface crack that he explained are caused by certain variables during the heat treating process that yield weaker, embrittled axles like the subject axle. (RR7:79-80) This is *why* Clauser opined that a change to the steel recipe would eliminate these manufacturing defects – because the variables that cause this embrittlement that weakens the axles would not yield defective units if the phosphorus were changed. Though Clauser could not specify which specific combination of these variables caused the embrittlement of this particular axle – he clearly did testify that some combination of these variable is the reason that an axle would be embrittled and weakened as was the subject axle.

Specifically, Clauser testified that the nature of the crack showed this was a "result of the material being embrittled" rather than a "ductile" or bending crack. (RR6:93) He explained how he knew this was an embrittlement crack and not a ductile crack based on his examination of the metal under a high-powered microscope. (Id.) Clauser explained that this "embrittlement" occurs because variables in the heat treating process create this embrittled metal when there is too much phosphorous present:

> Q. Okay. So that we have a clear answer to the specific question rather than just a general, why does .007 phosphorus – that's not very much -- matter, but in the context of going to 1050 steel and the fact that it's a hardened steel, is the difference between .010 phosphorus and .017 phosphorus, is it significant to the performance of the axle?
> A. Yes, sir.
> Q. And is it significant in the senses of -- what properties of the steel will it affect by having, as you are critical here, a defect in too much phosphorus in the design?

10

A. It embrittles it. It makes the steel brittle so that you don't get -- you don't get Herrera's numbers. You get the -- half of that.

Q. And have you seen -- now I'm going to the analysis you did. Have you seen with your own -- and I don't mean naked eye. It's under microscopic view -- of how much magnification to see that it's embrittled?

A. You started seeing it around 200, 300,000 times.

Q. And those are the slides you guys went through earlier with Mr. Wigington that show the difference between embrittled steel and -- the words I grabbed on is embrittled steel is the weaker steel.

A. Correct.

(RR7:88-89; 8:24-25) A reasonable jury could conclude that the heat treating process caused the metal of this particular axle to be produced with a subsurface crack in the metal, thereby creating an axle that was weaker than intended.

*Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex. 2006) and *Casey v. Toyota Motor Eng'g & Mfg of N. Am.*, 77 F.3d 322 (5th Cir. 2014), are also distinguishable. In *Mendez*, there was little more than a passing reference on one and a half pages of testimony to a manufacturing defect by the plaintiff's expert, and no attempt to explain how the physical evidence from the tire was consistent with a defect created during the manufacture. The *Mendez* court concluded:

> These parting words relating to the cause of the tread separation were unreliable proof of a manufacturing defect. Milner did little more than throw out terms like "polishing" and "fracture surface" when stating, in conclusory fashion, that the belt separation must have originated at the plant.

*Id.* at 805. Here, by contrast, there are nearly forty pages of explanatory testimony, with photographs taken through a high-powered microscope, showing the jury how the steel of this particular axle was manufactured with a crack in the steel, how

11

Clauser knows from the condition of the metal how the subsurface crack in the steel was created during the manufacturing process, and how such embrittlement happens during the heat treating process. (RR6:68-111) The jury was not left to guess why this axle was too weak to withstand expected levels of force. Unlike *Mendez*, the expert provided a clear, detailed and reliable explanation of how this axle left Ford's control in a condition more dangerous than other Ford axles.

In *Casey*, the court concluded that a violation of a performance standard "without more" is insufficient to prove a manufacturing defect. The problem in that case was the plaintiff's failure to identify "a specific defect" as the cause of damages. *Id.* at 326 & n8. The plaintiff's evidence in *Casey* was solely "result-oriented" and "not manufacturing-oriented," and thus gave no explanation as to the specific nature of the alleged manufacturing defect in the product. *Id.* at 328. Here, by contrast, in addition to the failure of the product to meet expected performance standards, Clauser provided a lengthy and detailed "manufacturing-oriented" explanation of how the heat treating process caused this particular axle to be produced in its embrittled condition – different from and more dangerous than the other Ford axles.

Moreover, in *Casey*, the court concluded that there was no evidence that the product performed any differently than any other product produced by Toyota, and thus the claim could only be a design defect claim. *Id.* at 328-29 & n8. However, the evidence here showed that this particular axle was weakened as a result of embrittlement that occurred during the manufacturing process, making it fracture in

12

response to forces that regular, non-embrittled axles would have withstood. It was different from, and more dangerous than, other axles produced by the same design and manufacturing process.

The evidence in this case is light years beyond what the plaintiffs produced in *Mendez* and *Casey*. A specific defect was identified – the steel of this axle was embrittled during the manufacturing process (specifically during the heat treating). There was evidence that this defect made the subject axle different from and more dangerous than axles that were not manufactured with subsurface cracking. Finally, there was evidence that the failure of the axle during this sideways slide at relatively low forces started with and was caused by the specific manufacturing defect identified by Clauser. The jury should have been asked to determine whether there was a manufacturing defect in the axle.

**II.      THE TRIAL COURT DID NOT MAKE ANY DAUBERT/ROBINSON RULING; CLAUSER'S OPINIONS ABOUT MANUFACTURING DEFECT WERE BASED ON A RELIABLE FOUNDATION**

The trial court did not grant a directed verdict because it found Clauser's opinion testimony unreliable. And Ford has never contested Clauser's expert qualifications. There is no ruling sustaining a *Daubert/Robinson* objection to Clauser's testimony. The trial court allowed Clauser to testify about all of his opinions. Rather, it is clear from the record that the trial court granted directed verdict on the manufacturing defect because the trial court was convinced that the claim was solely for design defect since there was an allegation about the recipe for the steel:

13

[Ford's counsel]: I – I do believe that the complaint here is about the recipe. If we didn't have the right ingredients, had he put in a different ingredient, we would –
The Court: Okay. I – I tell you what. My recollection of the testimony is
( -- I am – I'm going to agree with you, Ford.

(RR13:91-92)

Thus, the reliability of Clauser's opinions and admissibility under *Daubert/Robinson* were never ruled on by the trial court. There is certainly nothing in the record to indicate that Ford's reliability objections were sustained or that Clauser's testimony was stricken from the record. Even if this issue were ripe for the Court's consideration, Ford would have to prove that the trial court abused its discretion in allowing Clauser to testify about his manufacturing defect opinions. *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 718-719 (Tex. 1998)( acceptance of expert testimony reviewed for abuse of discretion); *Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750 (Tex. App. – San Antonio 2002, no pet.)("We review evidentiary rulings, including rulings on expert testimony, for an abuse of discretion.").

Ford cannot meet that burden because Clauser supported his opinions with reliable facts and a reliable methodology. First, as detailed extensively in Appellants' brief, there was a lengthy explanation in the record of how Clauser examined the fractured metal surface of the subject axle under powerful microscopes and found tangible, physical evidence that the fracture of the axle occurred as a result of an "intergranular" fracture – and that this fracture, in turn, resulted from a subsurface

14

crack created during the heat treating process when the axle was manufactured. (RR6:69-94)

Moreover, *three* different accident reconstructionists testified before the jury that the axle broke before the pickup rolled over – including two non-retained experts who reconstructed the accident for the State of Texas. (RR4:110-114, 141, 207-210, 213-214) Neither side's experts disagreed that the forces applied to the axle during this sideways slide were around 32,000 inch pounds – as little as a quarter of the force it should have taken to break an ordinary axle. (RR13:39-40)

Ford's defensive theory, which it tries to recast as a *Daubert/Robinson* challenge, is that its own retained accident investigator disagrees with Greenlees and Sergeant Hardwick that the axle broke prior to the truck rolling over. In other words, Ford's theory of the case, which it presented through its own controverting experts, was that the axle broke *after and as a result of* the truck rolling over. Critically though, Ford's engineering expert tacitly conceded that *if* the axle broke at 32,000 inch pounds of force and there were signs of a defect that caused it to fail, then it was defective. (RR13:39-40)

In short, the fact issue about which the expert's actually disagreed was whether the axle fracture was the cause or the victim of the rollover. That was a matter entrusted to the jury. And even in this appeal Ford does not challenge the expert opinions from Greenlees or Sergeant Hardwick supporting that the axle failed when subjected to around ¼ of the amount of force it was intended to withstand.

15

Ford focuses on the idea that Clauser was unable to say which specific combination of variables during the heat treating process were present that caused this subsurface fracture to occur. But that is a red herring. Clauser's physical examination found the actual crack in the metal and he explained how it got there.

In fact, Dr. Herrera saw the crack as well, agreeing that it was "not caused by a bending load," but that he otherwise had no explanation for the crack. (RR13:30-31) This is a critical concession, because Ford's entire theory of the case was that the axle broke from a bending load after the truck began to roll over. If the fracture site shows an intergranular fracture, rather than a microvoid coalescence consistent with a bending load, then Clauser is correct – this was a manufacturing defect that existed before the truck rolled.

As for Clauser's explanation for the crack in the metal at the origin of the fracture, he was quite specific and detailed in supporting his conclusion. It was an intergranular crack formed around the individual grain boundaries in the crystal of the metal. (RR6:72, 75-77) This sort of crack results from the metal being embrittled during the manufacturing process, not from dynamic bending loads, as Ford's theory of the case would require. (RR6:72-73) Rather, if Ford were correct, the origin of the fracture would show "microvoid coalescence" where several holes or voids in the metal pull together into a fracture. (RR6:77)

Not only did Dr. Herrera agree that there was a subsurface crack in the axle that he could not explain, but in discussing the "hardness" testing of the axle, Dr.

16

Herrera also agreed that phosphorous content changes the brittleness of the steel (what Herrera called the "plasticity" of the steel – the ability to bend without breaking under the force of an impact). (RR13:24-25) The concept of plasticity or embrittlement is distinct from "hardness." (Id.) Thus, when asked about the "hardness" testing that Ford discusses at length (the "Rockwell-C Hardness Test") in its brief to this Court, Dr. Herrera conceded that a test for the "hardness" of the steel does not measure brittleness of the metal, which is the non-conformity at issue in this case. (RR13:26) Dr. Herrera also agreed that an intergranular fracture was a sign of "brittle" metal. (RR13:36) While this does not correlate to "weakness" or "hardness" it *does* correlate to the embrittlement that Clauser testified was the deviation from the planned output in this particular axle.

Clauser supported this opinion with a peer-reviewed article. He relied on a publication the American Society for Metals called "Fractography and the Atlas of Fractographs" (RR6:78-80) Based on the appearance of the fracture site and comparing it to the information from the American Society of Metals, Clauser was able to demonstrate for the jury that the axle broke because of an intergranular fracture and not a microvoid coalescence – as Ford's theory of the case would require. (RR6:79-84).

Finally, Clauser linked this embrittlement specifically to the activity of phosphorous during the heat treating process. (RR6:77, 99, 106-107) During the heat treating process, phosphorous causes edges to form around the grains in the steel that

make the steel more brittle. (RR6:99) Thus, Clauser supported his opinion that this axle was embrittled during the manufacturing process, resulting in a subsurface crack at the origin of what a microscopic examination showed to be an intergranular fracture. (RR6:69-94) The mere fact that changing the recipe to reduce the amount of phosphorous would make this problem less likely (or even eliminate it) does not change that the embrittlement of the steel is an unintended and occasional consequence of heat treating metal that contains phosphorous. It is a manufacturing defect – a deviation from the "planned output." It is more brittle and less able to withstand impact than it was supposed to be.

Clauser backed up his manufacturing defect opinion up with direct, microscopic, physical evidence, and checked it against peer-reviewed sources. It was corroborated by testimony from three accident reconstructionists who agreed that the axle fractured at a fraction of the force it should have resisted. Since the jury could have agreed with those accident reconstructionists that the fracturing of the axle was the cause and not a victim of the roll over, then the jury should have been asked a question about manufacturing defect based on the evidence in this record.

## CONCLUSION

The trial court abused its discretion by granting directed verdict on the De Los Santos plaintiffs' manufacturing defect claim and refusing to allow the jury to consider the manufacturing defect theory that was supported by the evidence. The trial court did not abuse its discretion by allowing Clauser to testify about a manufacturing

18

defect opinion where he supported his opinions with a reliable scientific foundation. The judgment in this case should be reversed, and this case should be remanded for a new trial.

Respectfully submitted,

Brendan K. McBride
State Bar No. 24008900
brendan.mcbride@att.net
THE MCBRIDE LAW FIRM
 Of Counsel to
GRAVELY & PEARSON, L.L.P.
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 472-1111 Telephone
(210) 881-6752 Facsimile

And

Jeffrey G. Wigington
State Bar No. 00785246
jwigington@wigrum.com
R. Reagan Sahadi
State Bar No. 24042369
rsahadi@wigrum.com
WIGINGTON RUMLEY DUNN
 & BLAIR, LLP
123 N. Carrizo St.
Corpus Christi, Texas 78401
(361) 881-7500
(361) 884-0487 (Facsimile)

COUNSEL FOR APPELLANTS,
JESUS DE LOS SANTOS, JR.
INDIVIDUALLY AND AS

19

REPRESENTATIVE OF THE ESTATE
OF JESUS FRANCISCO DE LOS SANTOS
AND JUAN DE LOS SANTOS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded on this 29th day of January, 2015 to Appellee's and Cross-appellant's counsel of record via electronic service through Texas.gov.

_____

Brendan K. McBride

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with the rules governing the length of briefs prepared by electronic means. The brief was prepared using Microsoft Word 2010. According to the software used to prepare this brief, the total word count, including footnotes, but not including those sections excluded by rule, is 4,956. The text of the body of this brief is in the Garamond font, size 14pt. The footnotes are produced in Garamond 12pt. font.

_____

Brendan K. McBride