ACCEPTED
04-14-00562-cv
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
7/22/2015 1:48:50 PM
KEITH HOTTLE
CLERK

# NO. 04-14-00562-CV

IN THE TEXAS COURT OF APPEALS FOR THE FOURTH DISTRICT
SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
7/22/2015 1:48:50 PM
KEITH E. HOTTLE
Clerk

* * * * *

**JESUS DE LOS SANTOS, JR., Individually and as Representative of the ESTATE OF JESUS FRANCISCO DE LOS SANTOS, and JUAN DE LOS SANTOS, Appellants; and MARCO ANTHONY SOLIS, JR., Cross-Appellant,**

v.

**FORD MOTOR COMPANY,**

**Appellee**

* * * * *

On Appeal from the 79th Judicial District Court
Jim Wells County, Texas
Trial Court Cause No. 11-08-50394-CV

* * * * *

## APPELLANTS' MOTION FOR REHEARING AND *EN BANC* MOTION FOR REHEARING

* * * * *

Respectfully submitted,

Brendan K. McBride
State Bar No. 24008900
Brendan.mcbride@att.net
MCBRIDE LAW FIRM Of Counsel to
  GRAVELY & PEARSON, LLP
425 Soledad, Suite 600
San Antonio, Texas 78205
(210) 472-1111
(210)881-6752 (Facsimile)

Jeffrey G. Wigington
State Bar No. 00785246
jwigington@wigrum.com
R. Reagan Sahadi
State Bar No. 24042369
rsahadi@wigrum.com
WIGINGTON RUMLEY DUNN
  & BLAIR, LLP
123 N. Carrizo St.
Corpus Christi, Texas 78401
(361) 881-7500
(361) 884-0487 (Facsimile)

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... 2

TABLE OF AUTHORITIES ................................................................... 3

INTRODUCTION & SUMMARY .......................................................... 1

FACTS .............................................................................................. 6

ARGUMENT & AUTHORITIES ............................................................ 9

  A.  Appellants' Expert Specifically Identified The Manufacturing Defect; Cases Relied On By The Court Involved Failure To Identify A Specific Defect ............ 10

  B. The Majority's Opinion Presents A Substantial Departure From The Established Law of Strict Liability. ................................................................ 17

CONCLUSION & PRAYER .................................................................. 20

CERTIFICATE OF SERVICE ................................................................ 23

CERTIFICATE OF COMPLIANCE ........................................................ 23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997) .......................................... 11

*Casey v. Toyota Motor Eng'g & Mfg of N. Am.*, 77 F.3d 322 (5th Cir. 2014) ..... 4, 14, 15, 16

*Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex.1969) ................................................ 19

*De Los Santos v. Ford Motor Co.*, No. 04-14-005632-CV, 2015 Tex. App. LEXIS 6102 (Tex. App. San Antonio June 17, 2015, no pet. h.) ......................................................... 2

*Elbaor v. Smith*, 845 S.W.2d 240 (Tex. 1992) ...................................................................... 10

*Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194 (Tex. 2011) .................... 10

*Flying J Inc. v. Meda*, Inc.,373 S.W.3d 680 (Tex. App. – San Antonio 2012, no pet.) 9, 10

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) ................................................. 11, 14

*Ford Motor Co. v. Pool*, 688 S.W.2d 879 (Tex. App. – Texarkana 1985) ......................... 11

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598 (Tex. 2004) ...................................................... 19

*iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.*, 414 S.W.3d 842 (Tex. App. – Houston [1st Dist.] 2013, pet. denied) ................................................................ 4, 15, 16

*LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632 (Tex. App. – Dallas 2012, pet. denied) ................................................................................................................................. 9

*Olympic Arms, Inc. v. Green*, 176 S.W.3d 567 (Tex. App. – Houston [1st Dist.] 2004, no pet.) ............................................................................................................................ 16, 17

*State Office of Risk Mgmt. v. Martinez*, 300 S.W.3d 9 (Tex. App. – San Antonio 2009, pet. denied) ............................................................................................................................. 10

*Thiele v. Chick*, 631 S.W.2d 526 (Tex. App. – Houston [1st Dist.] 1982, no writ) .......... 19

*Triplex Communications Inc. v. Riley*, 900 S.W.2d 716 (Tex. 1995) .................................... 10

*Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex. 1979) ............................................ 19

**Rules**

TEX. R. CIV. P. 278 ................................................................................................ 10

## INTRODUCTION & SUMMARY

Appellant's seek rehearing or, in the alternative, rehearing *en banc*, of the Court's opinion in this product liability case based on a manufacturing defect in the axle of Ford pickup that allowed the axle to fracture, thereby causing a fatal rollover accident. The trial court granted a directed verdict and refused to submit a manufacturing defect theory for the jury's consideration, instructing the jury solely on "design" defects even though the pleadings and the evidence supported the submission of a "manufacturing" defect claim. Given the standard of review applicable to a directed verdict, the majority's opinion in this case does not give proper and full consideration to direct and circumstantial evidence that the axle of the Ford pickup in question was defectively manufactured.

The manufacturing defect claim was supported by all of the following:

(1) Ford's manufacturing process makes it possible for some of the axles to be manufactured with "embrittled" steel that causes subsurface intragranular fractures in the steel of those specific axles that become embrittled during manufacturing;

(2) The intragranular fractures in the steel can cause these defectively manufactured axles to fail in circumstances in which non-defective axles would not have failed.

(3) There was *direct* evidence that the specific axle in question had the specific type of subsurface cracking that results from embrittlement during Ford's manufacturing process;

(4) There was also direct evidence that the catastrophic failure of the axle that resulted in this fatal rollover occurred because of this embrittlement and intragranular fracture of the steel;

1

(5) There was evidence that the axle fractured during a sideways slide when subjected to approximately 32,000 inch pounds of force *before* the vehicle rolled over, thereby causing the rollover; and,

(6) All of the parties and their experts agreed that the axle was intended to withstand at least 120,000 inch pounds of force without fracturing, and that if it fractured at 32,000 inch pounds during the sideways slide, then the axle was defective.

Justice Martinez was correct in her dissent that that this record contains more than a scintilla of evidence to support Appellants' claim that the axle was defectively manufactured. The majority's opinion depends on two mistaken conclusion about the law and facts of this case.

First, the Court concluded that because Ford had no particular specification for the brittleness of its axles then there could be no evidence the embrittled axle at issue and the subsurface cracking that caused it to fail were a deviation from the "planned output." *De Los Santos v. Ford Motor Co.*, No. 04-14-005632-CV, 2015 Tex. App. LEXIS 6102, *11 (Tex. App. San Antonio June 17, 2015, no pet. h.)(Tab 1). However, the law does not require a claimant to prove that the defect in the product that renders it unreasonably dangerous under the "consumer expectations" test was in conflict with a particular specification. If that were the law, manufacturers of dangerous products would have a free pass specifically because they did not have detailed specifications to ensure their products were reasonably safe for consumers. This would effectively turn the consumer expectations test and the law of strict

2

liability on its head by *rewarding* manufacturers for *not* taking steps to ensure their products are reasonably safe.

Rather, the law simply requires evidence that would allow reasonable jurors to infer that the product deviated from Ford's intended output. There was *direct* evidence that this particular axle had subsurface cracks resulting from embrittlement during the manufacturing process that caused it to catastrophically fail where axles without this defect would not have failed. There are also circumstances from which reasonable jurors could conclude Ford did not intend to produce its axles with subsurface cracking that could cause the axle to fail when subjected to relatively low forces in a sideways slide on a roadway.

Second, the majority mistakenly concluded that Appellants were relying solely on the failure to meet a performance standard rather than identifying any particular manner in which the product deviated from planned output. The majority's conclusion is incorrect. There was *direct* evidence that the axle in question had subsurface cracking resulting from embrittlement during the manufacturing process. *The particular manufacturing defect at issue in this case was expressly and explicitly identified and demonstrated to the jury with objective evidence.* The evidence that the axle failed to meet the expected performance standard – fracturing at 32,000 inch pounds when it should have withstood up to 128,000 inch pounds – was relevant to show that the manufacturing defect in this particular axle was the cause of its failure, which otherwise would not have occurred had the axle not been defectively manufactured

3

and to act as additional circumstantial evidence of the product's malfunction. However, aside from its failure to perform as expected, there was direct evidence of how and why the axle failed – direct evidence of a specific manner in which it deviated from the axles Ford expected to produce.

The cases on which the majority relies are all distinguishable.[1] In each of those cases, the plaintiffs were relying on the failure of the product to perform without being able to identify the specific manner in which the product deviated from the intended output. Here – in stark contrast – there was more than a scintilla of evidence from which reasonable jurors could conclude that this particular axle was manufactured with subsurface embrittlement fractures in the steel that Ford did not intend. Indeed, having heard the evidence in this case, the jury itself was expecting to be instructed on manufacturing defect and sent out a written question to the trial court asking if they could find a manufacturing defect. (CR2:462; RR13:216-217; App. Tab 2)

Since this case involves review of a directed verdict, and there was more than a scintilla of evidence that the death of Jesus De Los Santos was caused by a manufacturing defect in the pickup's axle, this case should be remanded for a new trial. Appellants respectfully request the Court grant rehearing of this case and vacate

---

[1] *iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.*, 414 S.W.3d 842 (Tex. App. – Houston [1st Dist.] 2013, pet. denied); *Casey v. Toyota Motor Eng'g & Mfg of N. Am.*, 77 F.3d 322 (5th Cir. 2014).

the majority's opinion or, in the alternative, consider this case *en banc*, vacate the Panel's opinion, and remand this case for a new trial.

Jesus Francisco De Los Santos died when the 2005 Ford F-150 pickup truck in which he was a passenger rolled over on the evening of November 10, 2010. (RR4:157) The pickup was rounding a curve when the driver overcorrected. (RR4:109) The pickup went into a skid, during which the passenger-side rear axle broke, causing the left rear wheel to completely detach from the pickup. (RR4:110, 141)

The investigating DPS officer, Mauro Varela, explained there was a large gouge in the road where the truck began to roll. (RR4:110-113) Significantly, the gouge was a long line that pointed in the direction of the vehicle roll, leading both Varela and the State's accident reconstructionist, Sergeant Jarrett Hardwick, to conclude that the axle broke *before* the vehicle began to roll. (RR4:114-115) The broken edge of the axle dug into the road surface as it made the gouge mark, causing the pickup to catapult into the roll. (RR4:141, 207-210, 213-214) Hardwick, a Level 6 DPS crash investigator explained to the jury: "During the vehicle's movement around the curve as it's entering back on the road, I believe that the tire came off when the axle broke causing it to gouge the roadway." (RR4:213) Hardwick explained that there was so much physical evidence at the scene to support this conclusion that reconstructing this accident was "easy." (RR4:209-210)

The De Los Santos plaintiffs' retained accident reconstruction expert, William Greenlees, concurred with the conclusions reached by the DPS investigation and

reconstruction that the axle broke and wheel separated from the vehicle before the rollover. He explained that the right-rear wheel and tire separated from the vehicle causing the shock absorber assembly to gouge into the road surface. (RR8:59, 64-65; 9:84)

Joel Salinas, another passenger inside the pickup, also testified that he felt and heard a thump and "nasty cracking" sound as the pickup began to slide sideways before rolling. (RR4:165)

Ford's corporate representative testified that the axle should not ordinarily break during a "yaw" or sideways slide on a roadway. (RR5:63-64) To determine whether the axle broke because of a defect, it would be necessary to examine the "fracture surface," though he could not come up with any set of facts other than a lateral impact to the axle that would cause it to break unless it was defective. (RR5:65-67)

The De Los Santos plaintiffs' engineering and metallurgy expert, Craig Clauser, examined the fracture surface of the broken axle under a microscope, and had an explanation for why the axle failed – it was manufactured in such a way as to introduce a tiny crack in the metal – an "intragranular fracture," which weakened the strength of the axle causing it to fail under relatively ordinary operating conditions. (RR6:89-94) Clauser explained to the jury how the lines in the broken surface of the right, rear axle could be traced back under a microscope to identify the origin of the break. (RR6:69). A careful examination of the origin of the fracture showed the

7

break originated in an intragranular crack in the hardened steel. (RR6:88) The location of this crack, offset from the point on the axle that would have experienced the highest stress and running vertically instead of horizontally relative to the direction of the load on the axle, was the most likely cause of the axle's fracture. (RR6:89, 110-111) He could tell from the condition of the crack that this flaw in the metal had predated the rollover incident in question. (RR6:110) Clauser's review of peer-reviewed articles supported his opinion that the particular physical evidence from his microscopic examination of this axle – particularly the direction of the cracking relative to the forces applied during the yaw and nature of the separation between the grains in the steel – showed that it was broken as a result of an intragranular fracture. (RR6:69-76)

The trial court granted a partial directed verdict, ruling that there was evidence of a design defect, but finding that Clauser's criticism was exclusively in the nature of a design defect claim, and then refusing to allow the jury to be instructed about manufacturing defect. (RR13:84-86, 91-92) When the De Los Santos plaintiffs requested a charge that included a standard form PJC question on "manufacturing defect," the trial court refused the question and the jury was not instructed that they could find for the De Los Santos plaintiffs on a manufacturing defect theory. (RR13:118-119; CR2:348-359; SRR3)

The jury understood this was really a manufacturing defect case, and sent out a question during deliberations asking: "Should we ignore the possibility of a

8

manufacturing defect? The charge only asks about design defect." (CR2:462; RR13:216-217) The jury answered "no" regarding the defective product question, and since the court's charge only instructed them regarding design defect, this answer negated the only theory of liability the plaintiffs were permitted to submit. (CR2:350-52)

## ARGUMENT & AUTHORITIES

This case is before the Court as a result of a direct verdict and the trial court's refusal, over Appellants' objection, to submit a question or instruction that would allow the jury to consider Appellants' manufacturing defect theory. Underlying both problems is the single issue of whether there was factually sufficient evidence to support the manufacturing defect claim based on the record. Applying the standard of review for evidentiary sufficiency, there was more than a scintilla of evidence that the axle contained a manufacturing defect that was the cause of the rollover and resulting death of Jesus De Los Santos.

The standard of review for a directed verdict is a legal sufficiency or "no evidence" standard of review. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 642 (Tex. App. – Dallas 2012, pet. denied). In reviewing a directed verdict, the Court must "decide whether there is any evidence of probative value to raise an issue of material fact on the question presented," and "review the evidence in the light most favorable to the person suffering the adverse judgment." *Flying J Inc. v. Meda*, Inc., 373 S.W.3d 680, 685 (Tex. App. – San Antonio 2012, no pet.) (*quoting Exxon Corp. v.*

9

*Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 220 (Tex. 2011); *State Office of Risk Mgmt. v. Martinez*, 300 S.W.3d 9, 12 (Tex. App. – San Antonio 2009, pet. denied). If a fact issue is raised on a material question, a directed verdict is not proper and the issue must go to the jury. *Flying J* at 685.

Moreover, a trial court must submit in its charge to the jury all questions, instructions, and definitions raised by the pleadings and evidence. *See Triplex Communications Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *see also* TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). If there is some evidence to support a jury question and the court does not submit the question, the court commits reversible error. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). In determining whether a trial court should have submitted a question to the jury, the reviewing court must examine the record for evidence supporting submission and ignore all evidence to the contrary. *Id.* Conflicting evidence presents a fact question for the jury. *Id.*

### A. Appellants' Expert Specifically Identified The Manufacturing Defect; Cases Relied On By The Court Involved Failure To Identify A Specific Defect.

Contrary to the Court's opinion, Appellants did not rely on evidence of the failure to meet a performance standard as proof of a manufacturing defect. Rather, Appellants offered extensive *direct and specific evidence of how this particular axle deviated from the intended axles.* This was principally through Appellants' metallurgy expert, Craig

10

Clauser, who examined the fractured surface of the broken axle under a microscope, and specifically explained *why* the axle failed in relatively low forces.

A plaintiff has a manufacturing defect claim when a finished product deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997)(*citing Ford Motor Co. v. Pool*, 688 S.W.2d 879, 881 (Tex. App. – Texarkana 1985), *aff'd in part and rev'd in part on other grounds*, 715 S.W.2d 629 (Tex. 1986)); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41 n16 (Tex. 2007).

There was direct evidence of the manner in which the axle in this particular vehicle contained a deviation from the planned output. Clauser explained the axle was manufactured in such a way as to introduce a tiny crack in the metal – an "intragranular fracture" – which weakened the strength of the axle causing it to fail under relatively ordinary operating conditions. (RR6:89-94) From his investigation of the fracture surface, he confirmed that the failure of the axle that caused the truck to roll originated in this intragranular fracture in the steel. (RR6:88)

But that was not all. Clauser also explained how such an intragranular fracture is an unintended consequence of "embrittlement" of the steel that occasionally occurs during the manufacturing process. Clauser's examination of the axle showed a subsurface crack that he explained are caused by certain variables during the heat treating process that yield weaker, embrittled axles like the subject axle and produced this sort of subsurface fracture in the metal. (RR7:79-80)

11

Clauser explained that the nature of the crack showed this was a "result of the material being embrittled" rather than a "ductile" or bending crack. (RR6:93) He explained how he knew this was an embrittlement crack and not a ductile crack based on his examination of the metal under a high-powered microscope. (Id.) "Embrittlement" occurs because variables in the heat treating process create this embrittled metal when there is too much phosphorous present:

> Q. Okay. So that we have a clear answer to the specific question rather than just a general, why does .007 phosphorus – that's not very much -- matter, but in the context of going to 1050 steel and the fact that it's a hardened steel, is the difference between .010 phosphorus and .017 phosphorus, is it significant to the performance of the axle?
>
> A. Yes, sir.
>
> Q. And is it significant in the senses of -- what properties of the steel will it affect by having, as you are critical here, a defect in too much phosphorus in the design?
>
> A. It embrittles it. It makes the steel brittle so that you don't get -- you don't get Herrera's numbers. You get the -- half of that.
>
> Q. And have you seen -- now I'm going to the analysis you did. Have you seen with your own -- and I don't mean naked eye. It's under microscopic view -- of how much magnification to see that it's embrittled?
>
> A. You started seeing it around 200, 300,000 times.
>
> Q. And those are the slides you guys went through earlier with Mr. Wigington that show the difference between embrittled steel and -- the words I grabbed on is embrittled steel is the weaker steel.
>
> A. Correct.

12

(RR7:88-89; 8:24-25)  A reasonable jury could conclude that the heat treating process caused the metal of this particular axle to be produced with unintended subsurface cracking in the metal.

Clauser further explained that this embrittlement was not the intended output, but was a deviation from the axles Ford intended to produce:

> Q:  And you're saying that because of that composition of a recipe, when it goes through induction hardening, even though you do the induction hardening right, because the recipe is wrong, sometimes you believe you can have these little fractures that occur in subsurface [sic] of the axle, correct?
>
> A:  That – that is correct. . . . because the – the lower the phosphorus is, the more tolerant the steel is of deviations, variation in the – the induction hardening and tempering process . . .
>
> Q:  And because the recipe is wrong, sometimes, when you induction hardened [sic] or when you temper it, you could have embrittlement issues, and it makes it susceptible to embrittlement fractures?
>
> A:  Correct.
>
> Q:  It isn't true, in your opinion, that every single axle will experience this problem?
>
> A:  That is correct.
>
> Q:  Only some of them?
>
> A:  Yes.

(RR8:24-25)

Thus, a manufacturing defect was not presumed by the mere happening of an accident, nor solely because of the failure of the axle to meet an expected level of

13

performance as the majority mistakenly held. Rather, Clauser carefully examined the axle and found direct, objective evidence that the root cause of its failure was an intragranular crack in the metal that was not part of the intended output but that *sometimes* can result when the amount of phosphorous in the steel recipe allows the metal to be embrittled and cause *the specific, actual physical defect he found and described in the subject axle.*

In fact, there was no dispute that there was subsurface cracking in the metal of the axle – with Ford's own expert, Dr. Juan Herrera, acknowledging that there was an intragranular fracture in the metal of the axle, which he was unable to explain. (RR13:30-31) Certainly if an axle with weakened fracture points in the metal were part of the intended output it would be easy enough to explain that it was there because Ford expected it to be there.

This is far more than the evidence in the cases cited and relied on by the Court. In *Casey*, the court concluded that a violation of a performance standard "without more" is insufficient to prove a manufacturing defect. The problem in that case was the plaintiff's failure to identify "a specific defect" as the cause of damages. *Id.* 77 F. 3d at 326 & n8. The plaintiff's evidence in *Casey* was solely "result-oriented" and "not manufacturing-oriented," and thus gave no explanation as to the specific nature of the alleged manufacturing defect in the product. *Id.* at 328. Here, by contrast, in addition to the failure of the product to meet expected performance standards, Clauser provided a lengthy and detailed "manufacturing-oriented" explanation of how

14

the heat treating process caused this particular axle to be produced in its embrittled condition – different from and more dangerous than the other Ford axles.

Moreover, in *Casey*, the court concluded that there was no evidence that the product performed any differently than any other product produced by Toyota, and thus the claim could only be a design defect claim. *Id.* at 328-29 & n8. However, the evidence here showed that this particular axle was weakened as a result of embrittlement that occurred during the manufacturing process, making it fracture in response to forces that regular, non-embrittled axles would have withstood. It was different from, and more dangerous than, other axles produced by the same design and manufacturing process.

In *iLight*, the plaintiff's expert opined that there was extra solder causing a short inside a circuit board, but offered no explanation of whether this was more or less solder than called for in the product's design specifications. *Id.* 414 S.W.3d at 848. Since it remained possible that *every* board produced had this same dangerous condition, there was no evidence that the particular board in question deviated from the planned output or specifications. *Id.* Here, Clauser clearly explained that the intragranular fracture that caused *this particular axle* to fail was a result of tolerances within the manufacturing process that made it possible for this sort of defect to *sometimes* occur. Clauser explained that most of Ford's axles would not have this defect.

15

Thus, unlike *iLight* where there was no evidence to demonstrate that the defect was not an intended part of the design, *here* there was more than a scintilla of evidence that this sort of intragranular fracture was not the intended output, but an occasional defect that occurred during manufacture. And unlike *Casey*, the explanation for that defect and its nature was not based solely on a failure to perform as expected, but was rather clearly "manufacturing-oriented." *Casey*, 77 F.3d at 328.

The evidence of a specific, identifiable manufacturing defect in this case is considerably more what the plaintiffs produced in *Casey* or *iLight*. Clauser identified a specific, tangible manufacturing defect – the steel of this axle was embrittled during the manufacturing process (specifically during the heat treating) resulting in a particular, objective deviation – an intragranular fracture in the steel of this particular axle was the cause of its failure. Thus, the majority is simply mistaken about the record. This was not an attempt to rely solely on the failure to meet a performance standard as circumstantial evidence of a manufacturing defect without identifying the defect.

Remarkably similar evidence has been found sufficient to support a manufacturing defect finding. For instance, in *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 578 (Tex. App. – Houston [1st Dist.] 2004, no pet.), the theory was that the metal recipe used by the manufacturer for a rifle barrel made it possible for a certain type of weakness to form in the barrel during the manufacturing. Finding this was sufficient evidence to support a jury's manufacturing defect finding, the court explained:

16

Here, the record contains evidence that Olympic intended some inclusions to be present in the steel because the inclusions served a purpose. John Slater, Olympic's expert, explained that manufacturers deliberately add sulfur to stainless steel during the formation process to make the steel easier to machine. Without the addition of sulfur, stainless steel can be "extremely difficult" to machine, and the inclusions allow the steel to become "easily machinable." In asking for judgment notwithstanding the verdict, however, Olympic ignored McClelland's testimony regarding the correlation between the amount of sulfur and the resulting number of inclusions and the evidence suggesting that Olympic's barrel failed due to the presence of too many inclusions. Moreover, O'Day testified that he had witnessed another Olympic barrel fail shortly after Green's. O'Day sold that barrel around the time that he built Green's rifle. O'Day had that barrel tested, and the results of the analysis revealed that the steel in that barrel was also "full of inclusions," causing the barrel to split.

*Id.* at 578.

There was evidence that this defect made the subject axle different from and more dangerous than axles that were not manufactured with subsurface cracking. Finally, there was evidence that the failure of the axle during this sideways slide at relatively low forces started with and was caused by the specific manufacturing defect identified by Clauser. The jury should have been asked to determine whether there was a manufacturing defect in the axle.

### B. The Majority's Opinion Presents A Substantial Departure From The Established Law of Strict Liability.

One particularly troubling aspect of the majority's opinion in this case is the implication that a plaintiff cannot prove a deviation from planned output without some direct evidence of a standard set by the manufacturer. There are two problems with the majority's reasoning in that regard. First, it violates the well-established rule

17

that manufacturing defects (like any fact issue in Texas) can be established by circumstantial evidence. Second, it turns the protections intended by strict product liability actions on their head by relieving a manufacturer of liability for unreasonably dangerous products when the manufacturer sets no standards to assure its products are reasonably safe.

In this case, the evidence showed that Ford's "recipe" for the steel in its axles contained enough phosphorous that it enabled axles to occasionally be produced in an "embrittled" state prone to the type of intragranular fracture this axle showed. Ford tried to equivocate between its "hardness" standard and the products brittleness, but even its own corporate representative conceded these were different risks and that Ford had no standard for testing the brittleness of the steel in its axles.[2] Taking the lack of any standard for brittleness as its jumping off point, the majority concluded that there was no evidence the axle deviated from the planned output – despite evidence that embrittled axles were only an occasional occurrence in the production process. The majority's reasoning sets a dangerous precedent and changes the standards for proof in manufacturing defect cases under Texas law.

"Circumstantial evidence is probative evidence as to whether a product was defectively manufactured." *Thiele v. Chick*, 631 S.W.2d 526, 530 (Tex. App. – Houston

---

[2] This issue was a large focus of the oral argument in this case and was addressed with numerous citations to the record in a post-submission letter brief. In the interests of brevity, the post-submission letter, which includes quotations and references from the record regarding the difference between "hardness" and "brittleness" and the lack of any standard at Ford related to brittleness, is attached in the appendix, Tab 3, to this Motion for Rehearing.

18

[1st Dist.] 1982, no writ); *see also Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979); *Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex.1969). In *Darryl*, the Texas Supreme Court wrote:

> To exclude circumstantial evidence that the product was defective at the time of the sale would frustrate the beneficial purposes of the doctrine. It would be equally difficult, if not impossible, for the plaintiff to rebut by direct evidence all of the conceivable posibilities (sic) which would account for the defective condition other than the existence of the defect at the time of the sale. Such direct evidence should not be required, particularly when dealing with a latent defect.

*Id.* at 632; *see also Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)("Both direct and circumstantial evidence may be used to establish any material fact.").

The lack of a brittleness standard does not and cannot preclude the finding that the product was still unreasonably dangerous because it was more brittle and prone to intragranular fracture than Ford intended. A reasonable jury could infer from the following circumstances that the axle was not as Ford intended:

(1) The manufacturing method used by Ford makes it possible for some (but not all) of its axles to be manufactured in an "embrittled" state leading to the formation of subsurface cracks in the steel of those specific axles that become embrittled during manufacture;

(2) This subsurface cracking in the steel can cause these defectively manufactured axles to fail in circumstances in which non-defective axles would never fail;

(3) There was direct evidence that the axle in this case had the precise sort of subsurface cracking that results from embrittlement during manufacturing;

19

(4) There was direct evidence that the catastrophic failure of the axle occurred at the site of and was caused by this subsurface cracking in the steel;

(5) There was evidence that the axle fractured during a sideways slide when subjected to approximately 32,000 inch pounds of force *before* the vehicle rolled over, thereby causing the rollover; and,

(6) All of the parties and their experts agreed that the axle was intended to withstand at least 120,000 inch pounds of force without fracturing, and that if it fractured at 32,000 inch pounds during the sideways slide, then the axle was defective.

Thus, there was circumstantial evidence both that the product malfunctioned under circumstances in which it was not supposed to malfunction *and* evidence from which a reasonable jury could deduce the specific defect in the manufacture that caused it to so fail and that Ford did not intend to produce axles with embrittled steel like the axle at issue.

The majority clearly erred in not considering these circumstances and in relying far too heavily on Ford's lack of any brittleness standard. The approach taken by the majority in this case presents the very real danger of changing Texas law to give an advantage to product manufacturers specifically for *not* developing standards to ensure reasonably safe products end up in the hands of consumers. That is not Texas law, and it should not become Texas law.

## CONCLUSION & PRAYER

The majority's opinion is based on conclusions about the evidence that are at odds with the record. Given the narrow standard of review that prohibits the Court

20

from substituting its view of the evidence for that of a jury, and that prohibits a directed verdict where there is more than a scintilla of evidence to support the claim, the majority was mistaken in concluding there was not legally sufficient evidence to support the submission of a manufacturing defect theory to the jury.

A review of the whole record shows both direct and circumstantial evidence that the axle deviated from the planned output in a very specific way, and that this particular defect was the cause of the failure of the axle that would not have otherwise happened.

The Court should grant rehearing, vacate its opinion and judgment in this matter and reverse and remand this case for a new trial. In the alternative, should the Panel not grant rehearing, the Court should rehear this case *en banc*, vacate the majority's opinion and judgment and issue a new opinion and judgment reversing the directed verdict and judgment and remanding the case for a new trial.

Respectfully submitted,

Brendan K. McBride
State Bar No. 24008900
brendan.mcbride@att.net
THE MCBRIDE LAW FIRM
 Of Counsel to
GRAVELY & PEARSON, L.L.P.
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 472-1111 Telephone

21

(210) 881-6752 Facsimile

And

Jeffrey G. Wigington
State Bar No. 00785246
jwigington@wigrum.com
R. Reagan Sahadi
State Bar No. 24042369
rsahadi@wigrum.com
WIGINGTON RUMLEY DUNN
 & BLAIR, LLP
123 N. Carrizo St.
Corpus Christi, Texas 78401
(361) 881-7500
(361) 884-0487 (Facsimile)


COUNSEL FOR APPELLANTS,
JESUS DE LOS SANTOS, JR.
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE
OF JESUS FRANCISCO DE LOS SANTOS
AND JUAN DE LOS SANTOS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded on this 22nd day of July, 2015 to Appellee's and Cross-appellant's counsel of record via email and by electronic service through Texas.gov.

_____
Brendan K. McBride

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with the rules governing the length of briefs prepared by electronic means. The brief was prepared using Microsoft Word 2010. According to the software used to prepare this brief, the total word count, including footnotes, but not including those sections excluded by rule, is 5,312. The text of the body of this brief is in the Garamond font, size 14pt. The footnotes are produced in Garamond 12pt. font.

_____
Brendan K. McBride

# NO. 04-14-00562-CV

IN THE TEXAS COURT OF APPEALS FOR THE FOURTH DISTRICT
SAN ANTONIO, TEXAS

\* \* \* \* \*

**JESUS DE LOS SANTOS, JR., Individually and as Representative of the
ESTATE OF JESUS FRANCISCO DE LOS SANTOS, and JUAN DE LOS
SANTOS, Appellants; and MARCO ANTHONY SOLIS, JR., Cross-Appellant,**
**v.**
**FORD MOTOR COMPANY,**
**Appellee**

\* \* \* \* \*

On Appeal from the 79th Judicial District Court
Jim Wells County, Texas
Trial Court Cause No. 11-08-50394-CV

\* \* \* \* \*

## APPENDIX TO APPELLANTS' MOTION FOR REHEARING AND *EN BANC* MOTION FOR REHEARING


TAB 1:      Court's Opinion and Dissent by Justice Martinez.

TAB 2:      Written Question From Jurors During Deliberations.

TAB 3:      Appellants' Post-Submission Letter Brief Detailing Record Citations
            Regarding "Hardness" and "Brittleness" Standards.

# TAB 1

No *Shepard's* Signal™
As of: July 22, 2015 11:49 AM EDT

# *De Los Santos* v. *Ford* Motor Co.

Court of Appeals of Texas, Fourth District, San Antonio

June 17, 2015, Delivered; June 17, 2015, Filed

No. 04-14-00562-CV

**Reporter**
2015 Tex. App. LEXIS 6102

Jesus DE LOS SANTOS Jr., Individually and as Representative of the Estate of Jesus Francisco De Los Santos, Deceased, Juan De Los Santos, Individually, and Mark Soliz Jr., Appellants v. FORD MOTOR COMPANY, Appellee

**Prior History:** **[*1]** From the 79th Judicial District Court, Jim Wells County, Texas. Trial Court No. 11-08-50394-CV. Honorable Richard C. Terrell, Judge Presiding.

**Disposition:** AFFIRMED.

## Core Terms

axle, manufacturing defect, manufactured, crack, specifications, directed verdict, truck, deviated, unintended, planned, output, recipe, design defect, battery, trial court, steel, rear, no evidence, brittleness, pet, configuration, scintilla, pounds, loads

## Case Summary

### Overview

HOLDINGS: [1]-Court did not err in granting a directed verdict in favor of the automobile manufacturer on the manufacturing defect claim because the injured motorists failed to produce any evidence to establish that the axle deviated from the manufacturer's specifications or planned output or that the manufacturer treated the axle in an unintended manner or manufactured the axle in an unintended configuration.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN1* A trial court may instruct a verdict in favor of a defendant if a plaintiff fails to present any evidence that raises a fact issue on the material questions in a suit or if the evidence conclusively proves a fact that establishes a movant's right to judgment as a matter of law. When determining whether a directed verdict is properly granted, an appellate court applies a legal sufficiency or no evidence standard of review. Under this standard, the appellate court decides whether there is any evidence of probative value to raise an issue of material fact on a question presented, and the appellate court reviews the evidence in a light most favorable to a person suffering an adverse judgment. In other words, the appellate court must determine whether a nonmovant produces more than a scintilla of probative evidence to raise the fact issue. More than the scintilla of evidence exists when the evidence rises to a level that will enable reasonable, fair-minded persons to differ in their conclusions. The directed verdict is not proper when the nonmovant brings forth more than the scintilla of probative evidence, as viewed in the light most favorable to the nonmovant, to raise a genuine issue of material fact; in those cases, an issue must go to a jury. The appellate court can consider any reason the directed verdict should be granted, even if a reason is not stated in a party's motion.

Torts > Products Liability > Types of Defects > Manufacturing Defects

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN2* A manufacturing defect exists when a product deviates, in its quality or construction, from the specifications or

planned output in a manner that makes it unreasonably dangerous. A plaintiff must prove the product is defective when it leaves the hands of a manufacturer and that the defect is a producing cause of the plaintiff's injuries. The plaintiff need not identify exactly how the defect comes into being, only that the defect can be traced to the manufacturer. Furthermore, neither direct evidence nor expert testimony is required to establish the existence of the manufacturing defect. Often, the manufacturing defect can be proven only by circumstantial evidence, which is evidence that allows one to infer a fact based on the circumstances shown by a proponent of the fact.

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN3* For purposes of a manufacturing defect claim, evidence that a product deviates from a performance standard is not evidence that the product deviates from its specifications or planned output.

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN4* To prove a manufacturing defect claim, a plaintiff must present evidence of a product's deviation from specifications or planned output.

Torts > Products Liability > Types of Defects > Manufacturing Defects

*HN5* In the absence of evidence of a standard, evidence that a product is treated in an unintended manner can establish a manufacturing defect claim.

**Counsel:** For APPELLANT: Jeffrey G. Wigington, Wigington Rumley Dunn & Blair L.L.P., Corpus Christi, TX; Richard Sahadi, Corpus Christi, TX; Baldemar F. Gutierrez, Law Offices of Baldemar Gutierrez, P.C., Alice, TX; Brendan K. McBride, Gravely & Pearson, San Antonio, TX; F. Blake Dietzmann, Law Office of F. Blake Dietzmann, San Antonio, TX.

For APPELLEE: Allyson Ho, Morgan, Lewis & Bockius LLP, Dallas, TX; Denton Nichols, Morgan, Lewis & Bockius LLP, Houston, TX; Douglas A. Allison, Law Offices of Douglas Allison, Corpus Christi, TX; Guadalupe Aguilar,

AGUILAR LAW FIRM, PC, Corpus Christi, TX; Michael W. Eady, Thompson, Coe, Cousins & Irons, L.L.P., Austin, TX; Jaime A. Saenz, Colvin, Chaney, Saenz & Rodriguez, L.L.P., Brownsville, TX.

**Judges:** Opinion by: Marialyn Barnard, Justice. Dissenting Opinion by: Rebeca C. Martinez, Justice. Sitting: Karen Angelini, Justice, Marialyn Barnard, Justice, Rebeca C. Martinez, Justice.

**Opinion by:** Marialyn Barnard

# Opinion

**MEMORANDUM OPINION**

AFFIRMED

This is an appeal from a directed verdict in favor of Ford Motor Company ("Ford") in a products **[*2]** liability case.[1] On appeal, Jesus De Los Santos Jr., Individually and as Representative of the Estate of Jesus Francisco De Los Santos, Juan De Los Santos, and Mark Soliz Jr.[2] (collectively "Appellants") raise a single issue, contending the trial court erred in granting a directed verdict in favor of Ford on Appellants' manufacturing defect claim. We affirm the trial court's judgment.

### BACKGROUND

One evening, Mark Anthony Soliz Jr. was driving his family's 2005 Ford F-150 Super Crew pickup truck down a county road. Three of his friends, Joel Salinas and brothers, Jesus Francisco De Los Santos ("J.F. De Los Santos") and Juan De Los Santos, **[*3]** were riding with him. Juan De Los Santos was seated in the front passenger seat and J.F. De Los Santos and Mr. Salinas were seated in the left and right rear passenger seats, respectively. The group was on its way to Mr. Salinas's house when Mr. Soliz rounded a curve at an "unsafe speed," nearly swerving off the road. In an effort to prevent the truck from veering off the road, Mr. Soliz overcorrected, steering the truck sharply to the left. The truck skidded, rolled over onto the passenger side, and landed upside down. Mr. Soliz, Mr. Salinas, and Juan De Los Santos survived the accident without injury; however,

---

[1] The directed verdict was based on a manufacturing defect claim. Issues regarding an alleged design defect were submitted to the jury, which found in favor of Ford. The portion of the judgment relating to the design defect was not appealed.

[2] Although Mark Soliz Jr. identifies himself as a "cross-appellant," he is, in reality, an appellant. *See* Tex. R. App. P. 3.1 (defining "appellant" as "a party taking an appeal to an appellate court"). In his brief, Mr. Soliz adopts and fully incorporates the arguments of appellants Jesus De Los Santos Jr. and Juan De Los Santos.

J.F. De Los Santos, who was not wearing his seatbelt, was ejected through the left rear window and died at the scene. During the accident investigation, it was discovered that the right rear wheel assembly had broken and separated from the truck, causing the right rear wheel to detach from the truck.

Jesus Francisco De Los Santos Jr. and Juan De Los Santos filed suit against Ford on theories of strict products liability, breach of implied warranties, and negligence, alleging the truck's right rear wheel-to-axle assembly was defectively manufactured and designed. In addition [*4] to their claims against Ford, Jesus Francisco De Los Santos Jr. and Juan De Los Santos filed suit against Mr. Soliz and Mr. Soliz's father, alleging negligence. The Solizes then filed suit against Ford, also alleging Ford was liable for the defective manufacture and design of the right rear wheel-to-axle assembly. At trial, the core of the dispute centered on *when* and *why* the right rear wheel assembly broke and separated from the truck. The theory presented by Appellants was that the axle broke *before* the truck rolled over because of a crack that developed during the manufacturing process. According to Appellants, because of the crack, the axle was more vulnerable than it normally would have been when under pressure.

In support of their manufacturing defect claim, Appellants offered the testimony of an engineering and metallurgy expert, Craig Clauser. According to Mr. Clauser, the axle failed, i.e., broke, because of a subsurface crack, which was the result of brittle steel. Mr. Clauser testified he analyzed the broken axle and found a tiny crack in the metal. It was his belief the crack weakened the strength of the axle and caused it to fail. He further opined that based on the location [*5] and nature of the crack, the crack predated the rollover and, in fact, caused the rollover. Mr. Clauser also testified he believed the type of steel Ford used for its axles contained a high phosphorus level, and during the heat treating process, the axle became "embrittled" and thus, more susceptible to cracking. He further opined that he believed a design defect existed, but the root problem stemmed from the manufacturing process.

Ford presented its own expert, Dr. Juan Herrera, a mechanical and metallurgical engineer, to testify about the axle's fracture. According to Dr. Herrera, the crack in the axle did not predate the accident, nor was the crack a result of the truck's initial slide. Rather, Dr. Herrera testified the crack in the axle was a direct result of the rollover, occurring when the wheels slammed down on the asphalt *after* the truck rolled over. Dr. Herrera also testified he sent the axle to an independent lab for testing. The lab performed several tests, and each test confirmed the axle conformed to Ford's specifications. Dr. Herrera stated the tests established the amount of phosphorus in the axle, 0.017 percent, was within Ford's specifications, which required axles [*6] to contain no more than 0.03 percent of phosphorus, as well as within the Society of Automotive Engineers' ("SAE")[3] specifications, which required axles to contain no more than 0.04 percent. Therefore, the axle was not defective, suggesting the crack was sustained as a result of the roll over.

After the parties rested, Ford moved for a directed verdict on, among others, the manufacturing defect claim, arguing Mr. Clauser's testimony related to the *design* of the axle rather than an alleged manufacturing defect. According to Ford, Mr. Clauser specifically failed to identify how the axle deviated from Ford's specifications as required to sustain a manufacturing defect claim. The trial court granted Ford's motion for directed verdict on the manufacturing defect claim and submitted to the jury only issues relating to the design defect claim. The jury found there was no design defect, and the trial court rendered a take-nothing judgment based on the jury's verdict and the directed verdict. This appeal [*7] followed.

**ANALYSIS**

On appeal, Appellants contend the trial court erred in granting the directed verdict in favor of Ford on their manufacturing defect claim. According to Appellants, they produced evidence to support their claim that the axle was defectively manufactured. In response, Ford argues there is no evidence of a manufacturing defect because: (1) the evidence Appellants produced related to an alleged design defect as opposed to a manufacturing defect; and (2) Mr. Clauser's testimony was unreliable, thereby constituting no evidence.

*Standard of Review*

*HN1* A trial court may instruct a verdict in favor of a defendant if the plaintiff fails to present any evidence that raises a fact issue on the material questions in the suit or if the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77*

---

[3] According to the evidence at trial, SAE standards are internationally recognized for their role in ensuring safety, quality, and effectiveness of products in the mobility engineering industry.

*(Tex. 2000)*; *Ibarra v. Nat'l Const. Rentals, Inc., 199 S.W.3d 32, 37 (Tex. App.—San Antonio 2006, no pet.)* When determining whether a directed verdict was properly granted, we apply a legal sufficiency or no evidence standard of review. *LG Ins. Mgmt. Servs., L.P. v. Leick, 378 S.W.3d 632, 642 (Tex. App.—Dallas 2012, pet. denied)*; *Ibarra, 199 S.W.3d at 37*. Under this standard, "'we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented, and we review the evidence in the light most favorable to the person suffering [*8] the adverse judgment.'" *Flying J Inc. v. Meda, Inc., 373 S.W.3d 680, 685 (Tex. App.—San Antonio 2012, no pet.)* (quoting *Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348 S.W.3d 194, 220 (Tex. 2011))*; *LG Ins., 378 S.W.3d at 642*. In other words, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue. *LG Ins., 378 S.W.3d at 642*. "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003)*. A directed verdict is not proper when the nonmovant brings forth more than a scintilla of probative evidence, as viewed in the light most favorable to the nonmovant, to raise a genuine issue of material fact; in those cases, the issue must go to the jury. *Exxon Corp., 348 S.W.3d at 220-21*; *King Ranch, 118 S.W.3d at 751*; *Flying J Inc., 373 S.W.3d at 685*. We can consider any reason the directed verdict should have been granted, even if the reason is not stated in the party's motion. *Ibarra, 199 S.W.3d at 37*.

*Application*

**HN2** A manufacturing defect exists when a product deviates, in its quality or construction, from the specifications or planned output in a manner that makes it unreasonably dangerous. *Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 41-42 (Tex. 2007)*; *Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800 (Tex. 2006)*; *Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107, 111 (Tex. App.—San Antonio 2004, pet. denied)*. A plaintiff must prove the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Torrington Co. v. Stutzman, 46 S.W.3d 829, 844 (Tex. 2000)*. The plaintiff need not identify exactly how the defect came into being, only that the defect can be traced to the [*9] manufacturer. *Goodyear Tire, 143 S.W.3d at 111*. Furthermore, neither direct evidence nor expert testimony is required to establish the existence of a manufacturing defect. *Id.* Often, a manufacturing defect can be proven only by circumstantial evidence, which is evidence that allows one to infer a fact based on the circumstances shown by the proponent of the fact. *Id.*

At trial, Appellants relied on the expert testimony of Mr. Clauser to prove the existence of a manufacturing defect with regard to the axle. Mr. Clauser testified he analyzed the broken axle and found a tiny subsurface crack in the metal. According to Mr. Clauser, the crack, based on its location and nature, more than likely caused the rollover. Mr. Clauser testified he did not believe that every axle manufactured by Ford contained a crack like the axle in this case, and it was highly likely the crack was a direct result of Ford's "choice of recipe," i.e., using steel with a high phosphorous content. Mr. Clauser explained that because of the high phosphorous content, the steel became "embrittled" during the heat treating process, and as a result, it was more susceptible to cracks. Mr. Clauser also testified he believed Ford did not intend to manufacture [*10] brittle axles; rather, the axle was an unintended manufacturing defect. Mr. Clauser noted that Ford's expert, Dr. Herrera, opined that properly manufactured axles were capable of sustaining bending loads of more than 100,000 "inch pounds" or more. Mr. Clauser opined that in this case, the axle snapped at 40,000 to 50,000 "inch pounds," breaking at half the load a standard axle should be able to bear. Accordingly, Mr. Clauser believed the axle deviated from the expected standard — i.e., it contained a crack caused by embrittled steel — and failed to remain intact when sideways frictional forces were exerted upon it as the truck slid during the accident.

We hold that after viewing Mr. Clauser's testimony in a light most favorable to Appellants, it fails to demonstrate how the axle deviated in its construction or quality from Ford's specifications or planned output. *See iLight Technologies Inc. v. Clutch City Sports & Entertainment, L.P., 414 S.W.3d 842, 847 (Tex. App.—Houston [1st Dist.] 2013, pet denied)* (highlighting that it is necessary to show manufacturer's actual specifications or planned output for product to prove manufacturing defect); *Ledesma, 242 S.W.3d at 41-42*. At no point did Mr. Clauser testify about what Ford actually required with regard to axle specifications, if anything, vis-à-vis brittleness. Furthermore, there is nothing [*11] in the record showing what Ford's specifications or planned output in fact was with respect to brittleness or how much weight an axle was required to bear. Rather, Mr. Clauser's testimony merely shows how the axle may have deviated from Ford's *performance* standards, which were established by Dr. Herrera's testimony. Performance standards describe the intended result of a product, but do not indicate anything about the product's technical specifications or design. *See Casey v. Toyota Motor Engineering & Mfg. North America, Inc., 770 F.3d 322, 328 (5th Cir. 2014)*. Case law is clear that **HN3** evidence that a product deviated from a performance standard is not evidence that a product deviated from its

specifications or planned output. *See id.*; see *also iLight Technologies Inc., 414 S.W.3d at 847*. Here, Ford's expert testified properly manufactured axles were capable of sustaining bending loads of 100,000 ″inch pounds″ or more, and Mr. Clauser testified the axle snapped at 40,000 to 50,000 ″inch pounds,″ indicating it performed below an expected performance standard — testimony that is irrelevant to establishing a manufacturing defect.

In support of their contention that Mr. Clauser's testimony was sufficient to establish a manufacturing defect, Appellants rely on *Johnson Controls Battery Group, Inc. v. Runnels, No. 12-01-00183-CV, 2003 Tex. App. LEXIS 10956, 2003 WL 21191063 (Tex. App.—Tyler May 21, 2003, no pet.)* (op. on reh'g, mem. op.). In *Runnels*, a car battery exploded [*12] after only twenty months of use and injured Runnels. *2003 Tex. App. LEXIS 10956, [WL] at *6*. Runnels sued Johnson Controls, alleging a manufacturing defect. *2003 Tex. App. LEXIS 10956, [WL] at *1*. Runnels relied on expert testimony from Edward Mrotek, a principal engineer in the product design group at Johnson Controls, to prove the existence of a manufacturing defect. *Id.* After determining Mr. Mrotek's testimony was reliable, the appellate court reviewed Mr. Mrotek's testimony to determine whether it was sufficient to permit the jury to find a manufacturing defect existed with regard to the subject battery. *2003 Tex. App. LEXIS 10956, [WL] at *5-*6*. The expert testified that 95% of Johnson Controls batteries lasted longer than the subject battery, and the subject battery ″did not meet the standard.″ *2003 Tex. App. LEXIS 10956, [WL] at *6*. Based on this evidence, the court held there was sufficient evidence to permit the jury to find a manufacturing defect existed because the expert's testimony established some evidence that Johnson Controls had a standard regarding the expected life span of its batteries, and the battery in question did not meet that standard. *2003 Tex. App. LEXIS 10956, [WL] at *6*.

Here, unlike the expert in *Johnson Controls*, neither Mr. Clauser nor Dr. Herrera presented any evidence that Ford had a *standard* regarding brittleness or the weight an axle was [*13] required to sustain without breaking. Admittedly, Dr. Herrera testified properly manufactured axles were capable of sustaining bending loads of 100,000 ″inch pounds″ or more; however, there was no testimony this was a Ford standard. In fact, in their post-submission letter brief, Appellants admit Ford did not have a specification or test for the brittleness of the steel or its propensity to break when loaded sideways. The law is clear that **HN4** to prove a manufacturing defect claim, a plaintiff must present evidence of a product's ″deviation from specifications or planned output.″ *See Ledesma, 242 S.W.3d at 41*; *Cooper Tire & Rubber Co., 204 S.W.3d at 800*; *Goodyear Tire & Rubber Co., 143 S.W.3d at 111*.

Admittedly, **HN5** in the absence of evidence of a standard, evidence that a product was treated in an unintended manner can establish a manufacturing defect claim. *See iLight Technologies Inc., 414 S.W.3d at 848* (looking at whether appellant presented any evidence that product was manufactured in configuration unintended by appellee). However, in this case there is no evidence Ford treated the axle in an unintended manner or manufactured the axle in an unintended configuration, i.e., that it failed to follow the ″recipe.″ *See id.* In fact, Appellant's own expert believed Ford followed its intended configuration, but he disagreed with Ford's recipe, [*14] i.e., he believed the phosphorous amounts were too high. When posed with the following statement, ″You're saying that Ford didn't follow the recipe. Ford did follow the recipe. You're just saying you disagree with the recipe,″ Mr. Clauser stated, ″Yes, I disagree with the recipe.″ In short, it is possible Ford did exactly what it intended to do with respect to manufacturing the axle, but Ford utilized a steel that became ″embrittled″ during the heat treating process. Thus, according to Mr. Clauser's testimony, the defect, if any, in the axle is a design defect (a bad recipe) rather than a manufacturing defect (failure to follow the recipe), and as noted above, issues regarding an alleged design defect were submitted to and rejected by the jury. *See id. at 849* (pointing out product's specifications or planned output may have taken into consideration certain manufacturing processes and quantified them and in hindsight such processes may be matter of design defect).

Accordingly, after reviewing the evidence in the light most favorable to Appellants, we hold Appellants failed to present a scintilla of probative evidence to establish the axle deviated in its construction or quality from Ford's [*15] specifications or planned output or that Ford treated the axle in an unintended manner or manufactured the axle in an unintended configuration. *See Exxon Corp., 348 S.W.3d at 220-21*; *King Ranch, 118 S.W.3d at 751*; *Flying J Inc., 373 S.W.3d at 685*. Because there was no evidence to establish a manufacturing defect, the trial court did not err in granting the directed verdict as to the manufacturing defect claim.

## CONCLUSION

Based on our foregoing analysis, we overrule Appellants' sole appellate issue. We hold the trial court did not err in granting a directed verdict in favor of Ford on Appellants' manufacturing defect claim because Appellants failed to produce any evidence to establish the axle deviated from Ford's specifications or planned output or that Ford treated

the axle in an unintended manner or manufactured the axle in an unintended configuration. Accordingly, we affirm the trial court's judgment.

Marialyn Barnard, Justice

**Dissent by:** Rebeca C. Martinez

# Dissent

**DISSENTING OPINION**

A directed verdict is proper when no evidence of probative force raises a fact issue on a material element of the plaintiff's claim, or when the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs. Inc., 29 S.W.3d 74, 77 (Tex. 2000)*. I believe that in this case Appellants did present more than a scintilla of probative evidence **[*16]** to establish a manufacturing defect. Because the majority holds otherwise, I respectfully dissent.

Rebeca C. Martinez, Justice

# TAB 2

IN THE 79TH DISTRICT COURT

JIM WELLS COUNTY, TEXAS

CAUSE NO._____

FILED AT 4:08 O'CLOCK P M
R. DAVID GUERRERO

APR 16 2014

CLERK, DIST COURT, JIM WELLS CO. TEXAS
BY_____ DEPUTY

JURY NOTE/QUESTION NO. 1

TO THE HONORABLE JUDGE OF SAID COURT:

Should we ignore the possibility of a manufacturing defect? The charge only asks about design defect

FOREPERSON'S SIGNATURE: _____
OR PRESIDING JUROR

DATE: 4/16/2014

FILED AT 4:10 O'CLOCK P M
R. DAVID GUERRERO

APR 16 2014

CLERK, DIST COURT, JIM WELLS CO. TEXAS
BY_____ DEPUTY

TO THE MEMBERS OF THE JURY:

You are only to consider the questions presented in the Court's Charge.

SIGNED ON THIS 16 DAY OF April, 2014

_____
JUDGE RICHARD TERRELL

# TAB 3



**BRENDAN K. MCBRIDE**
Email: Brendan.McBride@att.net
OF COUNSEL

April 6, 2015

Keith E. Hottle, Clerk                                    ***Via E-filing at Texas.gov***
Texas Court of Appeals
Fourth District, San Antonio
300 Dolorosa, Suite 3200
San Antonio, Texas  78205

> **Re:**   Appellant's post-submission letter brief in *De Los Santos v. Ford*;
> **Cause No. 04-14-00562-CV**.

Dear Mr. Hottle:

Appellants have requested leave to file this responsive letter brief by separate motion.  If leave is granted, please forward this responsive letter brief to the panel members assigned to this appeal for their consideration.

During oral argument on March 26, 2015,      the  Court  asked  a  number  of  questions regarding the "hardness" and "strength" specifications for axle steel.  Ford's counsel indicated that there was a "hardness" specification and that the axle met that specification.  However, as the trial record indicates, the issue is not "hardness" but "brittleness."  As discussed below, even Ford's own litigation expert, Dr. Herrera, explained that Ford had *no specification or test for the brittleness of steel and propensity to break when loaded by sideways forces*.  This is the reason Dr. Herrera conducted his testing – to determine what the planned output was for axle resistance in "yaw" accidents like this one.

Clauser explained that the reason for the cracking and hence failure of the axle was that the metal had become "embrittled" during the heat treating process that is part of the axle's manufacture.  (RR6:148; 8:24-25)  Discussing the concept of "brittleness," Dr. Herrera explained that it was contrasted with what he called "plasticity."  (RR13:23-24)  Plasticity is the ability of the metal to deform without breaking when force is applied.  (RR13:24)  Critically, Dr. Herrera conceded that "hardness" testing is not a measure of the axle's "brittleness" or plasticity. (RR13:25)(Q: "Would you agree with me that hardness testing is not a measure of brittleness?" A:  "Agree.").

As noted extensively in the briefing and during oral argument, there was evidence of an "intergranular fracture" in the metal of the axle caused by the metal being too brittle:

Well, what's -- what's important about this crack is that, first of all, you can see the steps and the jaggedness. It's intergranular. It's the way a brittle crack would be, not a tough ductile crack. So it's the result of the material being embrittled . . . And we did some etching on this. And you can see that these steps match with the grain size of the structure, so it's an intergranular [sic] structural crack.

(RR6:93-94)

Again, Dr. Herrera explained that this sort of intergranular fracture would be related to the metal being "brittle," rather than being "weak":

Q: And I think you said intergranular fracture does not mean it's weak or brittle?

A: Correct. No, wait a minute. It's not weak. *Brittle, yes.* Remember exactly what I said. It's a mixed mode fracture. Typically, on brittle fractures you have more intergranular type fracture than transgranular or dimples, which the tucked-in fracture. *So you're – you're trying to equate brittleness to weakness. That's incorrect.*

(RR13:26, emphases added; see also RR12:111 (explaining that "brittle" failure of metal means "it doesn't stretch before it fails.")) One of the examples to contrast this that the jury heard were diamonds – they are certainly "strong" and not "weak," but they are also still "brittle" and subject to fracturing when a sufficient force is applied to them. (RR12:112)

The importance of this testimony to the issues raised by the Court's questions is crucial, because the record shows that Ford had a testing specification for "hardness" but not for brittleness. (RR12:120)(Dr. Herrera explaining that Ford specifies a standard on the "Rockwell-C hardness" test). The problem with this axle was its brittleness, not its hardness. Clauser's own testing at Anderson Labs confirmed the steel of the axle met the hardness specification. (RR12:121) And as noted above, Clauser's opinion that this axle was defectively manufactured was based on his conclusion that it was too brittle, not that it lacked hardness. However, as Clauser explained to the jury, there was an expectation by Ford that the axle would resist 32,000 inch pounds of lateral force without breaking, there was no other Ford specification for what point an axle should fracture during dynamic loading situations. (RR8:37) Ford's planned output was an axle that would not break when subjected to ordinary friction forces in a lateral slide or yaw. (Id.) Clauser saw no indication that Ford ever tested what specifically that level should be other than Dr. Herrera's testing for this case. (RR8:35-37) But Clauser, Dr. Herrera, Mr. Pascarella (see infra) and Ford's corporate representative were all in agreement that *if* the axle broke in this sideways slide it did *not* meet Ford's expectations. And as explained extensively in the briefing to the Court, Clauser had a detailed explanation as to how the

manufacturing process caused this particular axle to be embrittled and contain subsurface intergranular fractures.

Thus, there was no testing or quantified specification for the "brittleness" of the axles when subjected to a *lateral*, i.e. "side-to-side," dynamic force. Ford's corporate representative, Mr. Kalis, stated the closest testing done by Ford was the Axle Shaft Rolling Bending test, which he described as the closest to simulating the forces necessary to fracture the axle at the point where this axle broke. (RR5:41) This was a test where the axle was placed under a load pushing downward onto the axle. (Id.) However, Kalis admitted that this testing specification has no side-to-side component, he was not aware of any testing for lateral loading on the axles and, in fact, he did not know "what the axle load would be that would break the axle in a lateral sense." (RR4:43; 10:166-67) Though even Kalis agreed that the yaw in this accident imparted a "lateral load to the – to the axle." (RR5:46)

Thus, there was no specification created by Ford for the degree of "plasticity" (in Dr. Herrera's terminology) expected in a good axle subjected to a lateral load as happened in this sideways skid – except for the testing that Dr. Herrera did for this case that showed similar axles were supposed to resist nearly four times as much sideways force as was applied to the subject axle in this accident. As noted in Appellants' briefing, Dr. Herrera's testing showed the axles should have resisted up to 128,000 inch pounds, but he conceded that the most lateral force this axle would have been subjected to in this sideways slide was 32,000 inch pounds. (RR12:101,107)

Importantly, Dr. Herrera conceded that if the jury agreed the axle broke during the lateral slide rather than after the rollover, the axle would be defective. (RR13:39-40) Likewise, Ford's metallurgy expert, Mr. Pascarella, also agreed that if the jury were to determine the axle broke during the slide instead of during the roll, that it "did not meet[] Ford's requirements in terms of expectations." (RR11:103) And if that were the case, it would be a manufacturing defect. (Id.) Pascarella explained:

Q: And if it doesn't meet Ford's expectations, that's a bad apple in the batch?

A: If that were the case – again, based on what I know about this, I didn't see any maintenance issues with this particular axle, that's correct.

Q: Okay. And so it sounds like you're agreeing if it happened as described by Greenlees and the trooper, you agree it's a defective axle?

A: Again, I hesitate on the word "defective," but based on my analysis, I would not expect that to happen, and it would not meet Ford's requirements.

(RR11: 103-104)

There was abundant evidence that the axle broke during the slide before the rollover, including the accident reconstruction by the certified Texas DPS accident reconstructionist and the plaintiffs' accident reconstructionist, Mr. Greenlees. The jury should have been asked whether there was a manufacturing defect and the instructed verdict was reversible error.

Thank you in advance for your assistance in circulating this letter brief to the members of the Court's panel.

Sincerely,

Brendan K. McBride
McBride Law Firm, of counsel to
Gravely & Pearson, L.L.P.

Cc:
(via electronic service through Texas.gov)

Allyson Ho
Michael Eady